# JOHNSON, ADMINISTRATOR OF VETERANS' AFFAIRS, ET AL. v. ROBISON

No. 72–1297.  Argued December 11, 1973—Decided March 4, 1974

362

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 386.

*Gerald P. Norton* argued the cause for appellants. On the brief were *Solicitor General Bork, Acting Assistant Attorney General Jaffe, Harriet S. Shapiro, Morton Hollander,* and *William Kanter.*

*Michael David Rosenberg* argued the cause for appellee. With him on the brief were *Charles R. Nesson* and *Matthew Feinberg.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

A draftee accorded Class I–O conscientious objector status and completing performance of required alternative

---

*\*Donald S. Burris* filed a brief for the National Interreligious Service Board for Conscientious Objectors as *amicus curiae* urging affirmance.

civilian service [1] does not qualify under 38 U. S. C. § 1652 (a)(1) as a "veteran who . . . served on active duty" (defined in 38 U. S. C. § 101 (21) as "full-time duty in the Armed Forces"), and is therefore not an "eligible veteran" entitled under 38 U. S. C. § 1661 (a) to veterans' educational benefits provided by the Veterans' Readjustment Benefits Act of 1966.[2] Appellants, the Veterans'

---

[1] Title 50 U. S. C. App. § 456 (j) exempts from military service persons "who, by reason of religious training and belief," are opposed to participation in "war in any form."

Title 32 CFR § 1622.14 (1971) directed local Selective Service Boards that

"[i]n Class I–O shall be placed every registrant who would have been classified in Class I–A but·for the fact that he has been found, by reason of religious training and belief, to be conscientiously opposed to participation in war in any form and to be conscientiously opposed to participation in both combatant and noncombatant training and service in the armed forces."

Further, § 456 (j) and 32 CFR §§ 1660.1–.12 (1972) authorized local Selective Service Boards to order I–O conscientious objectors to perform alternative civilian service contributing to the maintenance of the national health, safety, or interest.

[2] Title 38 U. S. C. § 101 provides, in pertinent part:

"(21) The term 'active duty' means—

"(A) full-time duty in the Armed Forces, other than active duty for training."

Title 38 U. S. C. § 1652 (a)(1) provides:

"The term 'eligible veteran' means any veteran who (A) served on active duty for a period of more than 180 days any part of which occurred after January 31, 1955, and who was discharged or released therefrom under conditions other than dishonorable or (B) was discharged or released from active duty after such date for a service-connected disability."

Title 38 U. S. C. § 1661 (a) provides:

"Except as provided in subsection (c) and in the second sentence of this subsection, each eligible veteran shall be entitled to educational assistance under this chapter for a period of one and one-half months (or the equivalent thereof in part-time educational assistance) for each month or fraction thereof of his service on active

Administration and the Administrator of Veterans'
Affairs, for that reason, denied the application for edu-
cational assistance of appellee Robison, a conscientious
objector who filed his application after he satisfactorily
completed two years of alternative civilian service at
the Peter Bent Brigham Hospital, Boston. Robison
thereafter commenced this class action [3] in the United
States District Court for the District of Massachusetts,
seeking a declaratory judgment that 38 U. S. C. §§ 101
(21), 1652 (a)(1), and 1661 (a), read together, violated
the First Amendment's guarantee of religious freedom and
the Fifth Amendment's guarantee of equal protection of
the laws.[4] Appellants moved to dismiss the action on the

duty after January 31, 1955. If an eligible veteran has served a
period of 18 months or more on active duty after January 31, 1955,
and has been released from such service under conditions that would
satisfy his active duty obligations, he shall be entitled to educational
assistance under this chapter for a period of 36 months (or the
equivalent thereof in part-time educational assistance)."

The amount of money provided by the Act varies with the type
of educational program pursued and the number of dependents a
veteran has. For example, a veteran enrolled in a full-time college
or graduate degree program with two dependents receives $298 per
month. 38 U. S. C. § 1682 (a), as amended by the Vietnam Era
Veterans' Readjustment Assistance Act of 1972, § 102, 86 Stat. 1075.

[3] In defining the class the District Court stated: "The court also
rules that certification of a class, pursuant to Fed. Rule Civ. Proc.
23, is warranted, the class to include all those selective service
registrants who have completed 180 days of 'alternate service' pur-
suant to 50 U. S. C. App. § 456 (j), and who have either (1) satis-
factorily completed two years of such service or (2) been released
therefrom for medical or other reason after 180 days of such service."
352 F. Supp. 848, 851.

[4] Although "the Fifth Amendment contains no equal protection
clause, it does forbid discrimination that is 'so unjustifiable as to
be violative of due process.'" Schneider v. Rusk, 377 U. S. 163,
168 (1964); see Frontiero v. Richardson, 411 U. S. 677, 680 n. 5
(1973); Shapiro v. Thompson, 394 U. S. 618, 641–642 (1969); Bolling
v. Sharpe, 347 U. S. 497 (1954). Thus, if a classification would be

ground, among others, that the District Court lacked jurisdiction because of 38 U. S. C. § 211 (a) which prohibits judicial review of decisions of the Administrator.[5] The District Court denied the motion, and, on the merits, rejected appellee's First Amendment claim, but sustained the equal protection claim and entered a judgment declaring "that 38 U. S. C. §§ 1652 (a)(1) and 1661 (a) defining 'eligible veteran' and providing for entitlement to educational assistance are unconstitutional and that 38 U. S. C. § 101 (21) defining 'active duty' is unconstitutional with respect to chapter 34 of Title 38, United States Code, 38 U. S. C. §§ 1651–1697, conferring Veterans' Educational Assistance, for the reason that said sections deny plaintiff and members of his class due process of law in violation of the Fifth Amendment to the Constitution of the United States . . . ." 352 F. Supp. 848, 862 (1973).[6] We post-

invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment. See *Richardson* v. *Belcher,* 404 U. S. 78, 81 (1971).

[5] Title 38 U. S. C. § 211 (a) provides:

"(a) On and after October 17, 1940, except as provided in sections 775, 784, and as to matters arising under chapter 37 of this title, the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise."

[6] A second paragraph of the judgment declares that appellee and members of his class, who have satisfactorily completed two years of alternative civilian service, or who, after completing 180 days of such service, have been released therefrom, are to be considered "eligible" within § 1652 (a)(1) to receive benefits to the same degree and extent as veterans of "active duty"; and alternative service shall be considered "active duty" within § 101 (21) as applied only to c. 34 of Title 38. 352 F. Supp., at 862. In view of our result, this paragraph of the judgment is also reversed.

poned consideration of the question of jurisdiction in light of § 211 (a) to the hearing on the merits, and set the case for oral argument with No. 72–700, *Hernandez v. Veterans' Administration, post,* p. 391. 411 U. S. 981 (1973).[7] We hold, in agreement with the District Court, that § 211 (a) is inapplicable to this action and therefore that appellants' motion to dismiss for lack of jurisdiction of the subject matter was properly denied. On the merits, we agree that appellee's First Amendment claim is without merit but disagree that §§ 1652 (a)(1), 1661 (a), and 101 (21) violate the Fifth Amendment and therefore reverse the judgment of the District Court.

## I

We consider first appellants' contention that § 211 (a) bars federal courts from deciding the constitutionality of veterans' benefits legislation. Such a construction would, of course, raise serious questions concerning the constitutionality of § 211 (a),[8] and in such case "it is a

---

[7] The District Court's jurisdiction was invoked by appellee pursuant to 28 U. S. C. §§ 1331, 1337, 1343, and 1361. Appellants appealed pursuant to the provision of 28 U. S. C. § 1252 which provides:

"Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party."

The appellants do not appeal the District Court's adverse ruling upon two alternative grounds for dismissal: that the complaint failed to state a claim upon which relief could be granted, and that the plaintiff failed to exhaust available administrative remedies.

[8] Compare *Ex parte McCardle,* 7 Wall. 506 (1869); *Sheldon* v. *Sill,* 8 How. 441 (1850), with *Martin* v. *Hunter's Lessee,* 1 Wheat. 304 (1816); *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 84 (1936) (Brandeis, J., concurring). See Hart, The Power of Congress

cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question[s] may be avoided." *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971).

Plainly, no explicit provision of § 211 (a) bars judicial consideration of appellee's constitutional claims. That section provides that "the *decisions* of the Administrator on any question of law or fact *under* any law administered by the Veterans' Administration providing benefits for veterans . . . shall be final and conclusive and no . . . court of the United States shall have power or jurisdiction to review any such decision . . . ." (Emphasis added.) The prohibitions would appear to be aimed at review only of those decisions of law or fact that arise in the *administration* by the Veterans' Administration of a *statute* providing benefits for veterans. A decision of law or fact "under" a statute is made by the Administrator in the interpretation or application of a particular provision of the statute to a particular set of facts. Appellee's constitutional challenge is not to any such decision of the *Administrator,* but rather to a decision of *Congress* to create a statutory class entitled to benefits that does not include I–O conscientious objectors who performed alternative civilian service. Thus, as the District Court stated: "The questions of law presented in these proceedings arise under the Constitution, not under the statute whose validity is challenged." 352 F. Supp., at 853.

This construction is also supported by the administrative practice of the Veterans' Administration. "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the

to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362 (1953).

statute by the officers or agency charged with its administration." *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). The Board of Veterans' Appeals expressly disclaimed authority to decide constitutional questions in *Appeal of Sly,* C–27 593 725 (May 10, 1972). There the Board, denying a claim for educational assistance by a I–O conscientious objector, held that "[t]his decision does not reach the issue of the constitutionality of the pertinent laws as this matter is not within the jurisdiction of this Board." *Sly* thus accepts and follows the principle that "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies. See *Public Utilities Comm'n* v. *United States,* 355 U. S. 534, 539 (1958); *Engineers Public Service Co.* v. *SEC,* 78 U. S. App. D. C. 199, 215–216, 138 F. 2d 936, 952–953 (1943), dismissed as moot, 332 U. S. 788." *Oestereich* v. *Selective Service Board,* 393 U. S. 233, 242 (1968) (Harlan, J., concurring in result); see Jaffe, Judicial Review: Question of Law, 69 Harv. L. Rev. 239, 271–275 (1955).

Nor does the legislative history accompanying the 1970 amendment of § 211 (a) demonstrate a congressional intention to bar judicial review even of constitutional questions. No-review clauses similar to § 211 (a) have been a part of veterans' benefits legislation since 1933.[9]  While

---

[9] Section 5 of the Economy Act of 1933, 48 Stat. 9, which created the present Veterans' Administration, provided:

"All decisions rendered by the Administrator of Veterans' Affairs under the provisions of this title . . . shall be final and conclusive on all questions of law and fact, and no other official or court of the United States shall have jurisdiction to review by mandamus or otherwise any such decision."

In 1940 the no-review statute was amended, § 11, 54 Stat. 1197, to expand its application:

"Notwithstanding any other provisions of law . . . the decisions of the Administrator of Veterans' Affairs on any question of law or

the legislative history accompanying these precursor no-review clauses is almost nonexistent,[10] the Administrator, in a letter written in 1952 in connection with a revision

fact concerning a claim for benefits or payments under this or any other Act administered by the Veterans' Administration shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decisions."

When veterans' benefits legislation was finally consolidated in the Veterans' Benefits Act of 1957, § 211, 71 Stat. 92, the no-review clause was left substantially unaltered:

"[D]ecisions of the Administrator on any question of law or fact concerning a claim for benefits or payments under any law administered by the Veterans' Administration shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision."

[10] The only discussion of § 5 of the Economy Act of 1933 was in the Senate, where it was stated that § 5 "gives to the Veterans' Administration only such authority as the Administration now has." 77 Cong. Rec. 254 (1933).

The 1940 Act received little more discussion. However, Senator George remarked of the no-review clause:

"[T]he bill only confirms what has been the accepted belief and conviction, that with respect to any pension, [or] gratuity, . . . there is no right of action in the courts . . . . It is not so much a limitation as a restatement of what is believed to be the law upon the question." 86 Cong. Rec. 13383 (1940).

The House debate indicates that the no-review clause

"is desirable for the purpose of uniformity and to make clear what is believed to be the intention of Congress that the various laws shall be uniformly administered in accordance with the liberal policies governing the Veterans' Administration." Id., at 13491.

The legislative history attending the 1957 amendment to the no-review clause is similarly uninstructive, indicating only that the change was one of consolidation. See H. R. Rep. No. 279, 85th Cong., 1st Sess., 1 (1957); S. Rep. No. 332, 85th Cong., 1st Sess., 1 (1957). See Davis, Veterans' Benefits, Judicial Review, and the Constitutional Problems of "Positive" Government, 39 Ind. L. J. 181, 188–189 (1964); Comment, Judicial Review and the Governmental Recovery of Veterans' Benefits, 118 U. Pa. L. Rev. 288, 291–292 (1969).

of the clause under consideration by the Subcommittee of the House Committee on Veterans' Affairs, comprehensively explained the policies necessitating the no-review clause and identified two primary purposes: (1) to insure that veterans' benefits claims will not burden the courts and the Veterans' Administration with expensive and time-consuming litigation,[11] and (2) to insure that the technical and complex determinations and applications of Veterans' Administration policy connected with veterans' benefits decisions will be adequately and uniformly made.[12]

---

[11] "There is for consideration the added expense to the Government not only with respect to the added burden upon the courts, but the administrative expense of defending the suits."

Hearing on H. R. 360, 478, 2442 and 6777 before a Subcommittee of the House Committee on Veterans' Affairs, 82d Cong., 2d Sess., 1963 (1952).

[12] "In the adjudication of compensation and pension claims a wide variety of medical, legal, and other technical questions constantly arise which require the study of expert examiners of considerable training and experience, and which are not readily susceptible of judicial standardization. Among other questions to be determined in the adjudication of such claims are those involving length and character of service, origin of disabilities, complex rating schedules, a multiplicity of medical and physical phenomena for consideration intercurrently with such schedules, and the application of established norms to the peculiarities of the particular case. These matters have not been considered by the Congress or the courts appropriate for judicial determination but have been regarded as apt subjects for the purely administrative procedure. Due to the nature and complexity of the determinations to be made, it is inevitable that the decisions of the courts in such matters would lack uniformity. It cannot be expected that the decisions of the many courts would be based on the uniform application of principles as is now done by the Veterans' Administration through its system of coordination by the central office and by its centralized Board of Veterans' Appeals."

Hearing, *supra*, n. 11, at 1962–1963.

The legislative history of the 1970 amendment indicates nothing more than a congressional intent to preserve these two primary purposes. Before amendment, the no-review clause made final "the decisions of the Administrator on any question of law or fact *concerning a claim for benefits or payments* under [certain] law[s] administered by the Veterans' Administration" (emphasis added), 38 U. S. C. § 211 (a) (1964 ed.), 71 Stat. 92. In a series of decisions, *e. g., Wellman* v. *Whittier,* 104 U. S. App. D. C. 6, 259 F. 2d 163 (1958); *Thompson* v. *Gleason,* 115 U. S. App. D. C. 201, 317 F. 2d 901 (1962); and *Tracy* v. *Gleason,* 126 U. S. App. D. C. 415, 379 F. 2d 469 (1967), the Court of Appeals for the District of Columbia Circuit interpreted the term "claim" as a limitation upon the reach of § 211 (a), and as a consequence held that judicial review of actions by the Administrator *subsequent* to an original grant of benefits was not barred.

Congress perceived this judicial interpretation as a threat to the dual purposes of the no-review clause. First, the interpretation would lead to an inevitable increase in litigation with consequent burdens upon the courts and the Veterans' Administration. In its House Report, the Committee on Veterans' Affairs stated that "[s]ince the decision in the *Tracy* case—and as the result of that decision and the *Wellman* and *Thompson* decisions—suits in constantly increasing numbers have been filed in the U. S. District Court for the District of Columbia by plaintiffs seeking a resumption of terminated benefits." H. R. Rep. No. 91–1166, p. 10 (1970). This same concern over the rising number of court cases was expressed by the Administrator in a letter to the Committee:

"The *Wellman, Thompson,* and *Tracy* decisions have not been followed in any of the other 10 Federal judicial circuits throughout the country.

Nevertheless, soon after the *Tracy* decision, suits in the nature of mandamus or for declaratory judgment commenced to be filed in the U. S. District Court for the District of Columbia in constantly increasing numbers by plaintiffs seeking resumption of terminated benefits. As of March 8, 1970, 353 suits of this type had been filed in the District of Columbia circuit.

.      .      .      .      .

"The scope of the *Tracy* decision and the decisions upon which it is based is so broad that it could well afford a basis for judicial review of millions of decisions terminating or reducing many types of benefits provided under laws administered by the Veterans' Administration. Such review might even extend to the decisions of predecessor agencies made many years ago." *Id.,* at 21, 24.

Second, Congress was concerned that the judicial interpretation of § 211 (a) would involve the courts in day-to-day determination and interpretation of Veterans' Administration policy. The House Report states that the cases already filed in the courts in response to *Wellman, Thompson,* and *Tracy*

"involve a large variety of matters—a 1930's termination of a widow's pension payments under a statute then extant, because of her open and notorious adulterous cohabitation; invalid marriage to a veteran; severance of a veteran's service connection for disability compensation; reduction of such compensation because of lessened disability . . . [and] suits . . . brought by [Filipino] widows of World War II servicemen seeking restoration of death compensation or pension benefits terminated after the Administrator raised a presumption of their remarriage on the basis of evidence gathered through

field examination. Notwithstanding the 1962 endorsement by the Congress of the Veterans' Administrations [*sic*] administrative presumption of remarriage rule, most of [the suits brought by Filipino widows] have resulted in judgments adverse to the Government." *Id.,* at 10.

The Administrator voiced similar concerns, stating that "it seems obvious that suits similar to the several hundred already filed can—and undoubtedly will—subject nearly every aspect of our benefit determinations to judicial review, including rating decisions, related Veterans' Administration regulations, Administrator's decisions, and various adjudication procedures." Letter to the Committee on Veterans' Affairs 23–24.

Thus, the 1970 amendment was enacted to overrule the interpretation of the Court of Appeals for the District of Columbia Circuit, and thereby restore vitality to the two primary purposes to be served by the no-review clause. Nothing whatever in the legislative history of the 1970 amendment, or predecessor no-review clauses, suggests any congressional intent to preclude judicial cognizance of constitutional challenges to veterans' benefits legislation. Such challenges obviously do not contravene the purposes of the no-review clause, for they cannot be expected to burden the courts by their volume, nor do they involve technical considerations of Veterans' Administration policy. We therefore conclude, in agreement with the District Court, that a construction of § 211 (a) that does not extend the prohibitions of that section to actions challenging the constitutionality of laws providing benefits for veterans is not only "fairly possible" but is the most reasonable construction, for neither the text nor the scant legislative history of § 211 (a) provides the "clear and convincing" evidence of congressional intent required by this Court before a

statute will be construed to restrict access to judicial review. See *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 141 (1967).

## II

Turning to the merits, the District Court held that, by not including appellee and his class, the challenged sections of the Act create an arbitrary classification in violation of appellee's right to equal protection of the laws. In determining whether, in limiting the class of draftees entitled to benefits to those who serve their country on active duty in the Armed Forces, Congress denied equal protection of the laws to Selective Service registrants who perform alternative civilian service as conscientious objectors,[13] our analysis of the classification proceeds on the basis that, although an individual's right to equal protection of the laws "does not deny . . . the power to treat different classes of persons in different ways[;] . . . [it denies] the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly

---

[13] In an effort to enhance the attractiveness of service in the Public Health Service and the National Oceanic and Atmospheric Administration, the Act also makes educational benefits available to commissioned officers in those services. 38 U. S. C. §§ 101 (21), 1652 (a) (3). Officers in those services are usually specialists in various fields of science and possess a high degree of technical expertise. See 42 CFR §§ 21.11, 21.25–.31, 21.41–.42 (1972); 33 U. S. C. §§ 883a–883b. Appellee does not argue that he and his class, and the officers of those services, are so similarly circumstanced that the different treatment the Act accords the two groups constitutes a denial of equal protection.

circumstanced shall be treated alike.' *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920)." *Reed* v. *Reed,* 404 U. S. 71, 75–76 (1971).[14]

---

[14] Appellee argues that the statutory classification should be subject to strict scrutiny and upheld only if a compelling governmental justification is demonstrated because (1) the challenged classification interferes with the fundamental constitutional right to the free exercise of religion, and (2) I–O conscientious objectors are a suspect class deserving special judicial protection. We find no merit in either contention. Unquestionably, the free exercise of religion is a fundamental constitutional right. However, since we hold in Part III, *infra,* that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test. With respect to appellee's second contention, we find the traditional indicia of suspectedness lacking in this case. The class does not possess an "immutable characteristic determined solely by the accident of birth," *Frontiero* v. *Richardson,* 411 U. S., at 686, nor is the class "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process," *San Antonio School District* v. *Rodriguez,* 411 U. S. 1, 28 (1973). As the District Court observed:

"Congress, which is under no obligation to carve out the conscientious objector exemption for military training, see United States v. Macintosh, 1931, 283 U. S. 605, 624; Gillette v. United States, 1971, 401 U. S. 437, 457, 461 n. 23, has nevertheless done so. Perhaps this exemption from military training reflects a congressional judgment that conscientious objectors simply could not be trained for duty; but it is equally plausible that the exemption reflects a congressional determination to respect individual conscience. See United States v. Macintosh, *supra,* 283 U. S. at 633 ([Hughes,] C. J., dissenting). Given the solicitous regard that Congress has manifested for conscientious objectors, it would seem presumptuous of a court to subject the educational benefits legislation to strict scrutiny on the basis of the 'suspect classification' theory, whose underlying rationale is that, where legislation affects discrete and insular minorities, the presumption of constitutionality fades because traditional political processes may have broken down." 352 F. Supp., at 855.

Unlike many state and federal statutes that come before us, Congress in this statute has responsibly revealed its express legislative objectives in § 1651 of the Act and no other objective is claimed:

"The Congress of the United States hereby declares that the education program created by this chapter is for the purpose of (1) enhancing and making more attractive service in the Armed Forces of the United States, (2) extending the benefits of a higher education to qualified and deserving young persons who might not otherwise be able to afford such an education, (3) providing vocational readjustment and restoring lost educational opportunities to those service men and women whose careers have been interrupted or impeded by reason of active duty after January 31, 1955, and (4) aiding such persons in attaining the vocational and educational status which they might normally have aspired to and obtained had they not served their country."

Legislation to further these objectives is plainly within Congress' Art. I, § 8, power "to raise and support Armies." Our task is therefore narrowed to the determination of whether there is some ground of difference having a fair and substantial relation to at least one of the stated purposes justifying the different treatment accorded veterans who served on active duty in the Armed Forces, and conscientious objectors who performed alternative civilian service.

The District Court reasoned that objectives (2), (3), and (4) of § 1651 are basically variations on a single theme reflecting a congressional purpose to "eliminate the educational gaps between persons who served their country and those who did not." 352 F. Supp., at 858. Therefore,

"[t]he exclusion from eligibility of [appellee] and his class would be justified if they do not suffer the same disruption in educational careers as do military veterans, and thus are not similarly situated with respect to the statute's purpose. We believe . . . that the disruption is equal as between the two groups. Like military veterans, alternate servicemen have been exposed to the uncertainties caused by the draft law. They too were burdened at one time by an unsatisfied military obligation that adversely affected their employment potential; were forced, because of the draft law, to [forgo] immediately entering into vocational training or higher education; and were deprived, during the time they performed alternate service, of the opportunity to obtain educational objectives or pursue more rewarding civilian goals." *Id.*, at 858–859.

The error in this rationale is that it states too broadly the congressional objective reflected in (2), (3), and (4) of § 1651. The wording of those sections, in conjunction with the attendant legislative history, makes clear that Congress' purpose in enacting the Veterans' Readjustment Benefits Act of 1966 was not primarily to "eliminate the educational gaps between persons who served their country and those who did not," but rather to compensate for the disruption that military service causes to civilian lives. In other words, the aim of the Act was to assist those who served on active duty in the Armed Forces to "readjust" to civilian life. Indeed, as the appellants argue, Brief for Appellants 20 n. 18, "the very name of the statute—the Veterans' Readjustment Benefits Act—emphasizes congressional concern with the veteran's need for assistance in readjusting to civilian life."

Of course, merely labeling the class of beneficiaries under the Act as those having served on active duty in

the Armed Services cannot rationalize a statutory discrimination against conscientious objectors who have performed alternative civilian service, if, in fact, the lives of the latter were equally disrupted and equally in need of readjustment. See *Richardson* v. *Belcher,* 404 U. S. 78, 83 (1971). The District Court found that military veterans and alternative service performers share the characteristic during their respective service careers of "inability to pursue the educational and economic objectives that persons not subject to the draft law could pursue." 352 F. Supp., at 859. But this finding of similarity ignores that a common characteristic shared by beneficiaries and nonbeneficiaries alike, is not sufficient to invalidate a statute when other characteristics peculiar to only one group rationally explain the statute's different treatment of the two groups. Congress expressly recognized that significant differences exist between military service veterans and alternative service performers, particularly in respect of the Act's purpose to provide benefits to assist in readjusting to civilian life. These differences "afford the basis for a different treatment within a constitutional framework," *McGinnis* v. *Royster,* 410 U. S. 263, 271 (1973).

First, the disruption caused by military service is quantitatively greater than that caused by alternative civilian service. A conscientious objector performing alternative service is obligated to work for two years. Service in the Armed Forces, on the other hand, involves a six-year commitment. While active duty may be limited to two years, the military veteran remains subject to an Active Reserve and then Standby Reserve obligation after release from active duty. This additional military service obligation was emphasized by Congress as a significant reason for providing veterans' readjustment benefits. A section entitled "Compulsory Reserve requirements" of the Senate Report states:

"The hardships of cold war service are still further aggravated by the compulsory military Reserve obligation which the Government has imposed on all men who entered service after August 9, 1955. This obligation is, of course, in sharp contrast with the traditional military obligation which ends immediately upon discharge from active duty. More importantly, however, the Active Reserve obligation impedes the cold war veterans' full participation in civil life, which, in turn, again exposes them to unfair competition from their civilian contemporaries. The fact that veterans must discharge a post-Korean Reserve obligation involving drills and other military activities quite obviously enables their civilian contemporaries, by comparison, to make still more gains toward enjoyment of the fruits of our free enterprise society. . . . [F]or those men who wish to devote full time to their civil goals, the Reserve obligation constitutes a substantial supplementary burden." S. Rep. No. 269, 89th Cong., 1st Sess., 10 (1965).

Second, the disruptions suffered by military veterans and alternative service performers are qualitatively different. Military veterans suffer a far greater loss of personal freedom during their service careers. Uprooted from civilian life, the military veteran becomes part of the military establishment, subject to its discipline and potentially hazardous duty. Congress was acutely aware of the peculiar disabilities caused by military service, in consequence of which military servicemen have a special need for readjustment benefits. The Senate Report accompanying the Act states:

"Compulsory military service, because of its incompatibility with our traditions and national temperament, is not lightly imposed upon our

citizenry. Only war, or the imminent threat of war from unfriendly powers, creates the conditions, which, by the values of our society, justify this extraordinary deviation from our free enterprise, individualistic way of life. When, as now, the need for large but limited forces conflicts with our sense of equity which expects equal national service from all, we are concerned to find that less than half of our young men will ever be compelled to serve a substantial period in the *Military Establishment*.

.    .    .    .    .

"Action to redress the inequities of this situation is long overdue. Our post-Korean veterans are beset with problems almost identical with those to which the two previous GI bills were addressed. Like their fathers and elder brothers, post-Korean veterans lose time from their competitive civil lives directly because of military service. As a consequence, they lose valuable opportunities ranging from educational advantages to worthwhile job possibilities and potentially profitable business ventures. *In addition, after completion of their military service they confront serious difficulties during the transition to civil life.*

.    .    .    .    .

"The major part of the burden caused by these cold war conditions quite obviously falls upon those of our youths who are called to extended tours of active military service. *It is they who must serve in the Armed Forces throughout troubled parts of the world, thereby subjecting themselves to the mental and physical hazards as well as the economic and family detriments which are peculiar to military service and which do not exist in normal civil life.* It is they who, upon separation from

service, find themselves far, far behind those in their age group whose lives have not been disrupted by military service." S. Rep. No. 269, 89th Cong., 1st Sess., 3, 6–7, 8 (1965) (emphasis added).

See also H. R. Rep. No. 1258, 89th Cong., 2d Sess., 4 (1966).[15] Congress' reliance upon these differences between military and civilian service is highlighted by the inclusion of Class I–A–O conscientious objectors, who serve in the military in noncombatant roles, within the class of beneficiaries entitled to educational benefits under the Act.[16]

These quantitative and qualitative distinctions, expressly recognized by Congress, form a rational basis for

[15] Testimony and statements at a hearing on the proposed Veterans' Readjustment Benefits Act of 1966, before the Senate Subcommittee on Veterans' Affairs, reflect a consciousness of the special sacrifices made by veterans of military service. For example, Senator Yarborough, chairman of the subcommittee and author of the Act, remarked that "[t]he bill I have introduced provides an opportunity to demonstrate that we, as a nation, do recognize the extreme unique personal sacrifices extracted from our cold war veterans by their military service." "Their need is not based on the type of military duty they performed, but on the lack of opportunity to readjust back to civilian life after having been removed for 2 to 4 years." Hearings on S. 9 before the Subcommittee on Veterans' Affairs of the Senate Committee on Labor and Public Welfare, 89th Cong., 1st Sess., 6, 8 (1965). In testimony before the subcommittee Senator Mondale stated that "[t]he previous GI bills were not designed to reward veterans for the battle risks they ran, but were designed to assist them in readjusting to civilian life and in catching up to those whose lives were not disrupted by military service. And that is what the cold war GI bill is intended to do." Id., at 152.

[16] Title 50 U. S. C. App. § 456 (j) provides that I–A–O conscientious objectors may be inducted into the Armed Forces and assigned to noncombatant service. Thus, I–A–O conscientious objectors perform "active duty" as defined in 38 U. S. C. § 101 (21) and are therefore eligible under 38 U. S. C. §§ 1652 (a) (1), 1661 (a) to receive veterans' educational benefits.

Congress' classification limiting educational benefits to military service veterans as a means of helping them readjust to civilian life; alternative service performers are not required to leave civilian life to perform their service.

The statutory classification also bears a rational relationship to objective (1) of § 1651, that of "enhancing and making more attractive service in the Armed Forces of the United States." By providing educational benefits to *all* military veterans who serve on active duty Congress expressed its judgment that such benefits would make military service more attractive to enlistees and draftees alike. Appellee concedes, Brief for Appellee 28, that this objective is rationally promoted by providing educational benefits to those who *enlist*. But, appellee argues, there is no rational basis for extending educational benefits to *draftees* who serve in the military and not to draftees who perform civilian alternative service, since neither group is induced by educational benefits to enlist. Therefore, appellee concludes, the Act's classification scheme does not afford equal protection because it fails to treat equally persons similarly circumstanced.

The two groups of draftees are, in fact, not similarly circumstanced. To be sure, a draftee, by definition, does not find educational benefits sufficient incentive to enlist. But, military service with educational benefits is obviously more attractive to a draftee than military service without educational benefits. Thus, the existence of educational benefits may help induce a registrant either to volunteer for the draft or not seek a lower Selective Service classification.[17] Furthermore, once drafted, educational benefits may help make military service more palatable to a draftee and thus reduce a draftee's unwillingness to be a soldier. On the other hand, because a

---

[17] The lower classifications are listed and defined in 32 CFR §§ 1622.1–1623.2 (1973).

conscientious objector bases his refusal to serve in the Armed Forces upon deeply held religious beliefs, we will not assume that educational benefits will make military service more attractive to him. When, as in this case, the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory.[18]

### III

Finally, appellee argues that the District Court erred in holding that "the challenged exclusion does not abridge [appellee's] free exercise of his religion," 352 F. Supp., at 860. He contends that the Act's denial of benefits to alternative service conscientious objectors interferes with his free exercise of religion by increasing the price he must pay for adherence to his religious beliefs. That contention must be rejected in light of our decision in *Gillette* v. *United States,* 401 U. S. 437 (1971).

There, the petitioners, conscientious objectors to *particular* wars, argued that § 6 (j) of the Military Selective

---

[18] Appellee also contends that the Act violates his Fifth Amendment due process rights because, "[t]he exclusion of I–O conscientious objectors from the vital assistance provided by the Act's educational program is the product of a vindictive and harsh policy" whose "purpose is clearly to punish I–O conscientious objectors for adhering to their beliefs." Brief for Appellee 20, 51. To be sure, if that were the purpose of the exclusion of I–O conscientious objectors from the benefits of the Act, the classification would be unconstitutional, "[f]or if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *U. S. Dept. of Agriculture* v. *Moreno,* 413 U. S. 528, 534 (1973). However, we have not been cited to, nor has our own research discovered, a single reference in the legislative history of the Act to support appellee's claim. We therefore find appellee's claim wholly lacking in merit.

Service Act of 1967, 50 U. S. C. App. § 456 (j), which limits an exemption from military service to those who conscientiously object to "participation in war *in any form*" (emphasis supplied), infringed their rights under the Free Exercise Clause by requiring them to abandon their religious beliefs and participate in what they deemed an unjust war or go to jail. We acknowledged that

> "the Free Exercise Clause bars 'governmental regulation of religious *beliefs* as such,' *Sherbert* v. *Verner*, 374 U. S. 398, 402 (1963), or interference with the dissemination of religious ideas. See *Fowler* v. *Rhode Island*, 345 U. S. 67 (1953); *Follett* v. *McCormick*, 321 U. S. 573 (1944); *Murdock* v. *Pennsylvania*, 319 U. S. 105 (1943). It prohibits misuse of secular governmental programs 'to impede the observance of one or all religions or . . . to discriminate invidiously between religions, . . . even though the burden may be characterized as being only indirect.' *Braunfeld* v. *Brown*, 366 U. S., at 607 (opinion of Warren, C. J.). And even as to neutral prohibitory or regulatory laws having secular aims, the Free Exercise Clause may condemn certain applications clashing with imperatives of religion and conscience, when the burden on First Amendment values is not justifiable in terms of the Government's valid aims." 401 U. S., at 462.

We made clear, however, that "[o]ur cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government." "[Rather,] incidental burdens . . . [may be] strictly justified by substantial governmental interests . . . ." *Id.*, at 461, 462. Finding "the Government's interest in procuring the manpower necessary for military purposes, pursuant to the congressional grant of power to Congress

to raise and support armies[,] Art. I, § 8," "of a kind
and weight sufficient to justify under the Free Exercise
Clause the impact of the conscription laws on those who
object to particular wars," *id.*, at 462, 461, we held that
§ 6 (j) did not violate the Free Exercise Clause.

The challenged legislation in the present case does not
require appellee and his class to make any choice com-
parable to that required of the petitioners in *Gillette*.
The withholding of educational benefits involves only an
incidental burden upon appellee's free exercise of reli-
gion—if, indeed, any burden exists at all.[19]   As Part II,
*supra*, demonstrates, the Act was enacted pursuant to
Congress' Art. I, § 8, powers to advance the neutral,
secular governmental interests of enhancing military
service and aiding the readjustment of military personnel
to civilian life.   Appellee and his class were not in-
cluded in this class of beneficiaries, not because of any
legislative design to interfere with their free exercise
of religion, but because to do so would not rationally
promote the Act's purposes.   Thus, in light of *Gillette*,
the Government's substantial interest in raising and sup-
porting armies, Art. I, § 8, is of "a kind and weight"
clearly sufficient to sustain the challenged legislation, for
the burden upon appellee's free exercise of religion—the
denial of the economic value of veterans' educational
benefits under the Act—is not nearly of the same order

---

[19] By enacting legislation exempting conscientious objectors from
the well-recognized and peculiar rigors of military service, Congress
has bestowed relative benefits upon conscientious objectors by per-
mitting them to perform their alternative service obligation as civil-
ians.   Thus, Congress' decision to grant educational benefits to mili-
tary servicemen might arguably be viewed as an attempt to equalize
the burdens of military service and alternative civilian service, rather
than an effort by Congress to place a relative burden upon a consci-
entious objector's free exercise of religion.   See Clark, Guidelines for
the Free Exercise Clause, 83 Harv. L. Rev. 327, 349 (1969).

or magnitude as the infringement upon free exercise of religion suffered by petitioners in *Gillette.* See also *Wisconsin* v. *Yoder,* 406 U. S. 205, 214 (1972).

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

In my dissent applicable to *Braunfield* v. *Brown,* 366 U. S. 599, I expressed the view that Pennsylvania's Sunday closing law was unconstitutional as applied to Sabbatarians, see 366 U. S., at 561, 575, 577. The State imposed a penalty on a Sabbatarian for keeping his shop open on the day which was the Sabbath of the Christian majority; and that seemed to me to exact an impermissible price for the free exercise of the Sabbatarian's religion. Indeed, in that case the Sabbatarian would be unable to continue in business if he could not stay open on Sunday and would lose his capital investment. See *id.,* at 611.

In *Girouard* v. *United States,* 328 U. S. 61, we held, in overruling *United States* v. *Schwimmer,* 279 U. S. 644, that the words of the oath prescribed by Congress for naturalization—"will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic"—should not be read as requiring the bearing of arms, as there is room under our Constitution for the support and defense of the Nation in times of great peril by those whose religious scruples bar them from shouldering arms. We said: "The effort of war is indivisible; and those whose religious scruples prevent them from killing are no less patriots than those whose special traits or handicaps result in their assignment to duties far behind the fighting front. Each is making the utmost contribution according to his capacity. The fact that his role may be limited by religious convictions rather than by physical characteristics has

no necessary bearing on his attachment to his country or on his willingness to support and defend it to his utmost." 328 U. S., at 64–65.

Closer in point to the present problem is *Sherbert* v. *Verner,* 374 U. S. 398, where a Seventh Day Adventist was denied unemployment benefits by the State because she would not work on Saturday, the Sabbath day of her faith. We held that that disqualification for unemployment benefits imposed an impermissible burden on the free exercise of her religion, saying: "Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to [forgo] that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.,* at 404.

And we found no "compelling" state interest to justify the State's infringement of one's religious liberty in that manner. *Id.,* at 406–408.

In *Wisconsin* v. *Yoder,* 406 U. S. 205, we held that Wisconsin's compulsory school attendance law as applied to Amish children would gravely impair the free exercise of their religious beliefs.

The District Court in the present case said that the penalty which the present Act places on conscientious objectors is of a lesser "order or magnitude"[1] than that

---

[1] "First, the denial is felt, not immediately, as in *Sherbert,* but at a point in time substantially removed from that when a prospective conscientious objector must consider whether to apply for an exemption from military service. Secondly, the denial does not

which has been upheld in past cases. 352 F. Supp. 848, 860.

That is true; yet the discrimination against a man with religious scruples seems apparent. The present Act derives from a House bill that had as its purpose solely an education program to "help a veteran to follow the educational plan that he might have adopted had he never entered the Armed Forces." H. R. Rep. No. 1258, 89th Cong., 2d Sess., 5. Full benefits are available to occupants of safe desk jobs and the thousands of veterans who performed civilian type duties at home and for whom the rigors of the "war" were far from "totally disruptive," to use the Government's phrase. The benefits are provided, though the draftee did not serve overseas but lived with his family in a civilian community and worked from nine until five as a file clerk on a military base or attended college courses in his off-duty hours. No condition of hazardous duty was attached to the educational assistance program. As Senator Yarborough said,[2] the benefits would accrue even to those who never served overseas, because their "educational progress and opportunity" "[have] been impaired in just as serious and damaging a fashion as if they had served on distant shores. Their educational needs are no less than those of their comrades who served abroad."

But the line drawn in the Act is between Class I–O conscientious objectors who performed alternative civilian

---

produce a positive economic injury of the sort effected by a Sunday closing law or ineligibility for unemployment payments. Considering these factors, the court doubts that the denial tends to make a prospective alternate service performer choose between following and not following the dictates of his conscience." 352 F. Supp. 848, 860.

[2] Hearings on Legislation to Provide GI Benefits for Post-Korean Veterans before the House Committee on Veterans' Affairs, 89th Cong., 1st Sess., 2899.

service and all other draftees. Such conscientious objectors get no educational benefits whatsoever. It is, indeed, demeaning to those who have religious scruples against shouldering arms to suggest, as the Government does, that those religious scruples must be susceptible of compromise before they will be protected. The urge to forgo religious scruples to gain a monetary advantage would certainly be a burden on the Free Exercise Clause in cases of those who were spiritually weak. But that was not the test in *Sherbert* or *Girouard*. We deal with people whose religious scruples are unwavering. Those who would die at the stake for their religious scruples may not constitutionally be penalized by the Government by the exaction of penalties because of their free exercise of religion. Where Government places a price on the free exercise of one's religious scruples it crosses the forbidden line.[3] The issue of "coercive effects," to use another

---

[3] *Gillette* v. *United States*, 401 U. S. 437, is irrelevant to the present case. There we were concerned with whether the petitioners were validly excluded from classification as conscientious objectors. Here the question is whether the Government can penalize the exercise of conscience it concedes is valid and which exempts these draftees from military service. Moreover, in *Gillette* we relied upon the fact that the Government's classification was religiously neutral, *id.*, at 451, imposed only "incidental burdens" on the exercise of conscience, and was "strictly justified by substantial governmental interests that relate directly to the very impacts questioned," *id.*, at 462. Here the classification is not neutral but excludes only those conceded by the Government to have religious-based objections to war; and thus the burden it imposes on religious beliefs is not "incidental." And here we have no governmental interest even approaching that found in *Gillette*—the danger that, because selective objection to war could not be administered fairly, our citizens would conclude that "those who go to war are chosen unfairly or capriciously [resulting in] a mood of bitterness and cynicism [that] might corrode the . . . values of willing performance of a citizen's duties that are the very heart of free government." *Id.*, at 460. The only governmental interest here

Government phrase, is irrelevant. Government, as I read the Constitution and the Bill of Rights, may not place a penalty on anyone for asserting his religious scruples. That is the nub of the present case and the reason why the judgment below should be affirmed.

---

is the financial one of denying this appellee and his class educational benefits. That in my view is an invidious discrimination and a penalty on those who assert their religious scruples against joining the Armed Services which shoulder arms.