**Erwin W. RASTETTER et al.,**
**Plaintiffs,**

**v.**

**Caspar WEINBERGER, Secretary of Health, Education and Welfare, and the United States of America, Defendants.**

**No. CIV 72–323 PHX—CAM.**

United States District Court,
D. Arizona.

July 24, 1974.

Langerman, Begam & Lewis, by Frank Lewis, Phoenix, Ariz., for plaintiffs.

William C. Smitherman, U. S. Atty., D. Ariz., by George Nielsen, Asst. U. S. Atty., Phoenix, Ariz., for defendants.

## OPINION and ORDER

Before KILKENNY, Circuit Judge, and EAST and MUECKE, District Judges.

MUECKE, District Judge.

Plaintiffs are a group of Medicare recipients in Arizona who are seeking to declare the provisions of 42 U.S.C. § 1395x(r) unconstitutional on the grounds that it excludes chiropractors and naturopaths from its definition of "physician."

The plaintiffs are also attempting to overturn the provisions of Part B of Title XVIII (Public Law 89–97, 79 Stat. 286) which provides up to eighty percent reimbursement for the reasonable costs of medical treatment performed by a licensed medical doctor or osteopath. The attack on this part of the Act is prompted by the fact that there is no provision under Part B for reimbursing Medicare recipients who utilize the services of many chiropractors and naturopaths.

Plaintiffs further desire an injunction against the Secretary of Health, Education and Welfare (HEW) and his agents seeking to prevent them from enforcing the aforesaid statutes and seeking to include doctors of chiropractic and naturopathy within the Medicare definition of "physician" with respect to treatment they are legally authorized to perform under state law.

The Medicare Act of 1966 was amended on July 1, 1973 through an expansion of 42 U.S.C. § 1395x(r) by redefining "physician" to include licensed chiropractors who meet the standards promulgated by the Secretary of HEW, but only with respect to treatment by " . . . manual manipulation of the spine (to correct a subluxation demonstrated by X–ray to exist) which he is legally authorized to perform by the state or jurisdiction in which such treatment is provided." The plaintiffs contend that § 1395x(r) still remains unconstitutional in that it continues to deny coverage to all naturopaths and many chiropractors whose licensed treatment is much broader than allowed by this statute.

The plaintiffs have stressed that § 1395x(r) as originally passed creates two classes of elderly persons enrolled under Part B of Medicare: those who pay federal taxes and Medicare premiums and receive treatment for illness or injury from licensed medical doctors or osteopaths, and those who bear the same taxes and costs and receive treatment from licensed chiropractors and naturopaths. The former are reimbursed for reasonable medical expenses, the latter receive nothing.[1] This classification, according to plaintiffs, is not rationally related to the purposes of Medicare and denies the plaintiffs equal protection of the law. The plaintiffs contend that Medicare should afford the freedom of

---

1. Except, of course, as previously noted "to correct a subluxation demonstrated by X-ray to exist . . .", etc.

choice in obtaining a full range of health services from any state licensed institution, agency, or practitioner and that the choice of selecting one's own doctor or other providers of health care services is a right which should be enjoyed by all Americans. Plaintiffs aver this right is curtailed by the failure to have many chiropractors and all naturopaths included in the Medicare Act.

To further bolster their position that the Medicare provisions as they relate to naturopaths and chiropractors are unconstitutional, plaintiffs point to the provisions of the Medicaid program which include coverage for treatment by naturopaths and chiropractors where provided for by state law.

The Medicaid program under Title XIX of the Social Security Act is a comprehensive health program that is federally financed and administered by some fifteen participating states where financial assistance is provided for all medical and remedial health care provided for under state law. The plaintiffs compare the Medicare and Medicaid Acts and point out the deficiencies of Medicare as contrasted to Medicaid. Medicaid, however, is a different law designed by Congress for a different purpose than Medicare.

The purpose of Medicaid is to " . . . assist the States to extend the scope and content, and improve the quality, of medical care and medical services for which payments are made to or on behalf of needy and low-income individuals . . . and in order to promote better public understanding about medical care and medical assistance for needy and low-income individuals . . . ."[2]

The Medicare program, however, is not a comprehensive health insurance program and still contains significant gaps in its coverage with respect to the needs of the elderly in areas of immunizations, drugs, therapeutics, optometrics, and dental care services. Because Medicare does not make all health services available to the elderly does not necessarily create a violation of equal protection for plaintiffs who are eligible to receive all of the benefits presently available under the Act.

The stated purpose of Medicare is not merely to protect its beneficiaries against major health care expenditures, but " . . . to make the best in modern medicine more available. . . ."[3] In accomplishing this purpose, Congress may legitimately proceed toward that end of providing "the best in modern medicine" one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

The mere fact that states have provided licensing schemes for various medical services does not imply that health care legislation passed by Congress must extend benefits based upon the same considerations which the states have used to determine whether and to what extent activities should be subject to licensing schemes. Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In the case, England v. Louisiana State Board of Medical Examiners, 246 F.Supp. 993 (E.D.La.1965), aff'd. mem., 384 U.S. 885, 86 S.Ct. 1924, 16 L.Ed.2d 998 (1966), in which a three-judge court upheld as reasonable a Louisiana chiropractic licensing law, the court said:

"If the education obtained in chiropractic schools does not meet the standards of the American Chiropractic Association and the United States Office of Education, it may well be that the Legislature of Louisiana felt that in the public interest a diploma from an approved medical school should be required of a chiropractor before he is allowed to treat all the

---

2. 42 U.S.C. § 1312 (1935).

3. Report of the Committee on Ways and Means on H.R. 6675, 89th Congress, 1st Session, House Report No. 213, p. 21.

human ailments chiropractors contend can be cured by manipulation of the spine." 246 F.Supp. at 997.

The defendant, United States of America, argues that Congress had a strong rational basis for excluding chiropractors and naturopaths from Part B Medicare coverage in that neither discipline possesses the high degree of professional medical training nor maintains the same standing within the healing arts as held by medical doctors and osteopaths. Further, neither chiropractors nor naturopaths are recognized as medical specialists by the American Medical Association, and neither are permitted to practice in any hospital accredited by the Joint Commission on Accredition of Hospitals.[4]

The 90th Congress in enacting Public Law 90–248, which involved the Social Security amendments of 1967, requested the Secretary of HEW to initiate and submit to Congress an Independent Practitioners Study of those health related practitioners seeking inclusion within the Medicare Act. Section 141 of that law provides:

"The Secretary shall make a study relating to the inclusion under the supplementary medical insurance program (Part B of title XVIII of the Social Security Act) of services of additional types of licensed practitioners performing health services in independent practice. The Secretary shall make a report to the Congress prior to January 1, 1969, of his findings with respect to the need for covering under the supplementary medical insurance program, any of the various types of services such practitioners perform and the costs to such programs of covering such additional services, and shall make recommendations as to the priority and method for covering these services and the measures that should be adopted to protect the health and safety of the individuals to whom such services would be furnished."

Pub.L. No. 90–248, § 141 (Jan. 2, 1967).

The Secretary of HEW used the following criteria for selecting the various professions for the study:

"[T]he profession provides a service used by the aged or frequently ordered by a physician as an aid to his diagnosis and treatment; it has a body of theory and techniques amenable to evaluation; its services are not covered in independent practice (with minor exceptions); it has a professional association that maintains a registry or a membership list of practitioners and that attempts some sort of standard-setting and other professional activities; and the professional association has expressed its wish for changes in Medicare coverage or methods of reimbursement. Meeting these criteria and therefore included in the study were: chiropractic, clinical psychology, corrective therapy, naturopathy, occupational therapy, optometry, physical therapy, social work, speech pathology and audiology."

HEW, Independent Practitioners Under Medicare: A Report to the Congress, at 7–8 (1968).

As part of the basis for the HEW Study, the professional organizations were asked to submit basic information about their professions, including: historical development and scientific bases of the practice; education and training; relationship with other health care institutions; and the needs of the elderly for the services of the profession.

The consultants selected for the Study were sought for their lack of bias and their knowledge of the area. None served as a representative of any health profession with a vested interest in the conclusions of the study. The panel members were selected for their scientific background and high professional reputations in their respective fields.[5] At

4. American Medical Director, pp. xiii–xiv (21st Ed., 1967).

5. HEW Report at 9–10.

the conclusion of the study, the findings as to naturopaths were:

"Naturopathic theory and practice are not based upon the body of basic knowledge related to health, disease, and health care which has been widely accepted by the scientific community. Moreover, irrespective of its theory, the scope and quality of naturopathic education do not prepare the practitioner to make an adequate diagnosis and provide appropriate treatment." HEW Report at 142.

The Study also dealt with chiropractors and indicated what were referred to as significant shortcomings in chiropractic education:

1. Lack of inpatient hospital training;
2. Lack of an adequate qualified faculty;
3. Extremely low admission requirements for students;
4. Lack of a nationally recognized accreditation body;
5. Such dissension within the profession that two separate accreditation programs must be maintained. HEW Report at 171–93.

At the conclusion of the Study, the conclusions and recommendations were made regarding chiropractors:

"1. There is a body of basic scientific knowledge related to health, disease, and health care. Chiropractic practitioners ignore or take exception to much of this knowledge despite the fact that they have not undertaken adequate scientific research.
2. There is no valid evidence that subluxation, if it exists, is a significant factor in disease processes. Therefore, the broad application to health care of a diagnostic procedure such as spinal adjustment is not justified.
3. The inadequacies of chiropractic education, coupled with a theory that de-emphasizes proven causa-

tive factors in disease processes, proven methods of treatment, and differential diagnosis, make it unlikely that a chiropractor can make an adequate diagnosis and know the appropriate treatment and subsequently provide the indicated treatment, or refer the patient. Lack of these capabilities in independent practitioners is undesirable because: appropriate treatment could be delayed or prevented entirely; appropriate treatment might be interrupted or stopped completely; the treatment offered could be contraindicated; all treatments have some risk involved with their administration, and inappropriate treatment exposes the patient to this risk unnecessarily.

4. Manipulation (including chiropractic manipulation) may be a valuable technique for relief of pain due to loss of mobility of joints. Research in this area is inadequate; therefore, it is suggested that research that is based upon the scientific method be undertaken with respect to manipulation." HEW Report at 196–97.

The Study makes the following recommendation for chiropractic:

"Chiropractic theory and practice are not based upon the body of basic knowledge related to health, disease, and health care that has been widely accepted by the scientific community. Moreover, irrespective of its theory, the scope and quality of chiropractic education do not prepare the practitioner to make an adequate diagnosis and provide appropriate treatment. Therefore, it is recommended that chiropractic service not be covered in the Medicare program."
HEW Report at 197.

In short, the conclusions contained in the Study recommended that neither chiropractors nor naturopaths be included in the Medicare Act.[6]

6. The Study also recommended that no changes be made regarding optometry, audiology, and corrective therapy.

■ In considering the constitutionality of these conclusions, a review of the applicable law in this area makes it clear that a statute in the field of health care is not necessarily violative of due process of law or equal protection simply because the Legislature has not provided for all possible situations in enacting reform legislation. Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L. Ed.2d 828 (1966).

■ A statute similarly is not invalid under the Constitution because it might have gone further than it did or because it may not succeed in bringing about the result that it intends to produce. Roschen v. Ward, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929). In Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), the court stated that equal protection requires that a classification established by statute:

" . . . 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike'." 415 U.S. at 374, 94 S.Ct. at 1169 quoting F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

In Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the United States Supreme Court stated:

"In the area of economics and social welfare, a State does not violate the Equal Protection clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'." 397 U.S. at 485, 90 S.Ct. at 1161 quoting Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S. Ct. 337, 55 L.Ed. 369 (1911).

■ It can be concluded, therefore, that 42 U.S.C. § 1395x(r) is not invalid on equal protection grounds simply because it creates a distinction between groups. So long as there is some rational basis, the statute must be upheld. This Court, accordingly, holds that Congress properly based its exclusion of chiropractors and naturopaths upon a rational legislative basis and upon the comprehensive findings and recommendations of the Study by the Secretary of Health, Education and Welfare of all affected health professions. Therefore, this Court grants Defendant United States of America's motion for summary judgment, and

It is ordered judgment will be entered accordingly.

In reaching this decision, this Court does not need to consider the class action question raised by plaintiffs regarding the certification of the plaintiffs' class and the instant plaintiffs' representation of it.