NORTHEAST EMERGENCY MEDICAL ASSOCIATES, P. C., Neema Emergency Medical, P. C., EPM Medical Associates, P. C., Northeast Emergency Medical Associates, P. C., t/a Physicians Emer. Assoc., Northeast Emergency Medical Associates, P. C., t/a Mercy Emergency Phys., Herbert T. Caskey, M. D., Joseph F. Nowoslawski, M. D.

v.

Joseph A. CALIFANO, Stanley Katz, Department of Health, Education and Welfare, Stanford Ross.

Civ. A. No. 79–581.

United States District Court, E. D. Pennsylvania.

May 11, 1979.

Tod I. Mammuth, Philadelphia, Pa., for plaintiffs.

William J. McGettigan, Asst. U. S. Atty., Philadelphia, Pa., for defendant H.E.W.

## MEMORANDUM

LUONGO, District Judge.

This civil action stems from a dispute over the proper interpretation of section 1842(b)(5) of the Social Security Act, 42 U.S.C. § 1395u(b)(5) (1976), *as amended by* Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub.L.No. 95–142, § 2(a)(1), 91 Stat. 1175 (1977). The corporate plaintiffs, under contracts with several Pennsylvania hospitals, have furnished physicians' services and other services in the emergency rooms of those hospitals since 1976. A Medicare patient treated in one of these emergency rooms typically assigns his right to receive Part B Medicare benefits for the emergency-room services to the particular corporate plaintiff involved, as payment for those services, and the benefits are then paid directly to that corporation by Pennsylvania Blue Shield, a local Medicare insurance carrier. *See generally* 42 U.S.C.A. § 1395u (West 1974 & Supp.1978). Late in 1978, however, Pennsylvania Blue Shield determined, after some prodding by the Medicare Bureau,[1] that section 1842(b)(5) of the Social Security Act prohibits assign-

ments of this type, and that payments would thereafter be made to the individual attending physician(s), rather than to plaintiff corporations. Plaintiffs filed this action, seeking a declaration that defendants—the Director of Technical Policy within the Medicare Bureau, the Secretary of HEW, and the Department of HEW—have misinterpreted the law, and that section 1842(b)(5) does *not* bar the assignment of benefits to the corporate plaintiffs. In addition, plaintiffs urge that they were denied procedural due process when defendants informally adopted their unfavorable interpretation of that provision without affording plaintiffs a prior hearing. Defendants now seek either (1) dismissal of the complaint for lack of subject-matter jurisdiction, or (2) summary judgment in their favor, and plaintiffs in turn seek summary judgment in *their* favor. For the reasons hereafter stated, I conclude that subject-matter jurisdiction is lacking with respect to plaintiffs' statutory claim, and that defendants are entitled to summary judgment on the merits of plaintiffs' constitutional claim.

The facts here are undisputed. In 1978, the regional office of the Medicare Bureau undertook a review of "reassignment accounts" established by Medicare insurance carriers in Region III. This review disclosed that Pennsylvania Blue Shield had established—and paid reassigned benefits into—six such accounts. Although each account bore a different corporate or fictitious name, each represented emergency-room services rendered by physicians under contract to Northeast Emergency Medical Associates, P. C. (NEMA), the first-named corporate plaintiff in this action. The Medicare Bureau then sought further information about NEMA from Pennsylvania Blue Shield, so that it could determine whether section 1842(b)(5) prohibited the assignment of benefits under these circumstances.

---

1. The Medicare Bureau is part of the Health Care Financing Administration, which in turn is part of the Department of Health, Education and Welfare.

In August of 1978, the director of the Bureau's Division of Program Operations wrote to a Mr. Tolin of Pennsylvania Blue Shield. Attachment A to Defendants' Motion (Document No. 6). His letter stated in part:

"Based on the information submitted, we do not believe that there was sufficient evidence to justify approval of [some of the NEMA] accounts. We realize that you are currently implementing new procedures for approving reassignment accounts and are currently updating all previously approved accounts. Nevertheless, we request that you immediately contact [NEMA] and review the validity of [the] accounts. We would also like you to verify whether or not the payments made by [NEMA] to the physicians are reported to the Internal Revenue Service on Form W–2.

In the event you find that [NEMA] is receiving payments for services rendered by physicians not in its employ, you should stop making payments to [NEMA] for services rendered by non-employee physicians. [NEMA] may continue to receive payments for those physicians documented to be in its employ. Finally, we would like you to complete action on this matter as soon as possible and report your findings to us."

Pennsylvania Blue Shield apparently cooperated fully with this request of the Medicare Bureau. According to the affidavit submitted by the Bureau's regional director:

"After examination of the contracts between the hospital[s] and NEMA, extensive correspondence with NEMA, and meetings between the carrier's employees and NEMA officers and its attorney, it was established that no employer-employee relationship existed between NEMA and the physicians who provided the medical services for which assignment had been made. The conclusion was based on the admission by NEMA that the physicians it supplies to hospitals are 'independent contractors' under subcontract, and on various indicia that support that admission, e. g., physician payments reported to the Internal Revenue Service on Form 1099 rather than on Form W–2." Hartman Aff. ¶ 3.

On November 20, 1978, Pennsylvania Blue Shield sent a series of letters to plaintiff Caskey. Each letter dealt with one of the NEMA reassignment accounts, and each stated that the account "will be dissolved effective immediately and will be removed from our files as an eligible provider thirty (30) days from the date of this letter (December 19, 1978)." Exhibits A–E to Complaint (Document No. 1). Each letter also stated that all future claims for Medicare benefits would "be processed and paid under the name and number of the individual doctor performing the services." *Id.* By way of explanation, Pennsylvania Blue Shield stated that, under the Social Security Act, benefits could be assigned to a group or corporate entity *only* where that entity either employed the physicians who actually performed the services or satisfied one of two other exceptions that are not material here. As the earlier correspondence quoted above confirms, Pennsylvania Blue Shield and the Medicare Bureau found that the absence of an employer-employee relationship between NEMA and the emergency-room physicians invalidated the several reassignment accounts that involved NEMA.

On January 2, 1979, plaintiffs' counsel wrote to defendant Katz, the Director of Technical Policy for the Medicare Bureau. Exhibit F to Complaint (Document No. 1). In that letter, counsel emphasized that the restrictions of section 1842(b)(5) applied only where payments were assigned to someone *other than* the patient who received the service or "the physician or other person who provided the service." Counsel argued that NEMA was a "person" who "provided" emergency-room services within the meaning of that provision, so that benefits could be assigned to NEMA without regard to whether an employer-employee relationship existed between NEMA and the physicians who actually performed the emergency-room services. Finally, counsel asked that "the Department" reconsider its

determination with respect to NEMA, and added: "In the event the Department's decision is not changed, [NEMA] wishes to exercise its right under the Social Security Act to a hearing by the Secretary [of HEW] and specifically requests that such a hearing be scheduled in this matter as soon as possible."

On February 2, 1979, defendant Katz replied to counsel's letter as follows:

"This is in reply to your letter of January 2, 1979, asking that we rescind the decision made by the Medicare carrier, Pennsylvania Blue Shield, to deny Medicare Part B benefits to [NEMA]. [NEMA] has been receiving such payments for the physician services that it makes available to hospital emergency rooms through subcontracts with independent physicians.

The basis for the carrier's decision denying payment to [NEMA] is section 1842(b)(5) of the Social Security Act, which provides that assigned Medicare Part B benefits may not be paid to anyone other than the physician or other person who [provided] the service, subject to certain exceptions which permit payment to the physician's or other person's employer or [to] the facility in which the physician or other person furnished the services.

You argue that [NEMA], as a professional corporation, is a person within the meaning of [section 1842(b)(5)] and that it *provides* physician services in hospital emergency rooms through independent subcontractor physicians.

We agree that [NEMA] is a person but do not agree that it *provides* physician services (and especially not the services of independent subcontractor physicians). Under the legislative scheme reflected in the Medicare law, only physicians provide physician services. That is why special provision was necessary for payment to employers [of physicians] and [to] medical facilities for physician services. (Corporations provide only nonphysician services.)

When the prohibition against reassignment . . . was enacted in 1972, the use of the professional corporation organizational structure had only recently become widespread. There is no evidence that Congress considered the professional corporation to be a provider of physician services.

. . . Since [NEMA] cannot be viewed as providing physician services and is not the employer of the physicians or the facility in which the physicians provide the services, the carrier's decision to deny payment on the claim is correct under the law.

Neither section 1869 of the Social Security Act nor any other section of that law provides a right of appeal to the Secretary on a Part B claim. Upon denial of his Part B claim, a claimant may request an independent review of that decision by the carrier. If the claimant is dissatisfied with the review decision, and the controversy involves $100 or more, the claimant may request a hearing before a hearing officer of the carrier . . . . Program regulations . . . require that the hearing officer, in exercising the authority to conduct a hearing, and render a hearing decision is to comply with all the provisions of title XVIII of the Social Security Act and regulations issued thereunder, as well as with policy statements, instructions and other guides issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the carriers. Thus, in deciding whether [NEMA] is a party entitled under the law to receive assigned Part B payments, the hearing officer would be guided to a large extent by the criteria in sections 3060–3060.3 of the Medicare Carrier's Manual."

Exhibit G to Complaint (Document No. 1) (emphasis in original).

On February 14, 1979, the Director of Professional Relations at Pennsylvania Blue Shield wrote to plaintiff Caskey. In part, this letter stated:

"The Medicare Bureau has provided me with a copy of Mr. Katz's letter of February 2, 1979 to [plaintiffs' counsel]. Based on the contents of that letter . . . I

will remove the . . . six [NEMA] accounts from the Pennsylvania Blue Shield file on February 22, 1979. . .

Effective February 22, all Medicare Part B . . . claims submitted must be generated in the individual name of the doctor performing the service. Any claims submitted in the name of [NEMA] will be delayed until we can identify the specific doctor who provided the service."

Attachment B to Defendants' Motion (Document No. 6). As the same letter made clear, Pennsylvania Blue Shield would also cease paying into the NEMA accounts for services rendered to Blue Shield subscribers who were *not* covered under Medicare. Blue Shield "stated to plaintiffs that in order to maintain uniformity in and processing of medical claims by their office and considering the fact that they are the intermediary for 'Medicare,' they also will no longer pay plaintiffs for medical services rendered to their subscribers." Affidavit in Support ¶ 17, Exhibit BB to Plaintiffs' Motion (Document No. 5).

Plaintiffs filed the complaint in this action on February 13, 1979. They initially sought a temporary restraining order and a preliminary injunction, but counsel then advised the court of an agreement whereby termination of the NEMA reassignment accounts was postponed until March 26, 1979. As a result, plaintiffs no longer sought interim relief, but chose instead to await a ruling on the merits of their claims in the normal course of judicial business.

In their complaint and in their brief, plaintiffs rely on two provisions of the Judicial Code as alternative bases for jurisdiction here: general federal-question jurisdiction, 28 U.S.C. § 1331(a) (1976), *as amended by* Pub.L.No. 94–574, § 2, 90 Stat. 2721 (1976), and the mandamus statute, 28 U.S.C. § 1361 (1976). Defendants contend that

neither provision can properly support jurisdiction. As is so often the case with litigation under the Social Security Act, the question whether subject-matter jurisdiction exists here is at least as difficult as any question bearing on the merits of this action. The parties to this litigation at first focused largely on the merits, and at oral argument I asked counsel to file supplemental briefs on the jurisdictional problems presented here. I have reviewed those supplemental briefs, and I shall now proceed to consider whether either of the provisions cited above can support jurisdiction over part or all of plaintiffs' case.

The Medicare program is governed by subchapter XVIII of the Social Security Act, 42 U.S.C.A. §§ 1395–1395qq (West 1974 & Supp.1978). Section 1872 of the Act, 42 U.S.C. § 1395ii (1976), states that several provisions of subchapter II, most notably 42 U.S.C. § 405(h) (1976), "shall also apply with respect to [subchapter XVIII] to the same extent as they are applicable with respect to subchapter II of [the Social Security Act]." Section 405(h) contains both a general limitation on judicial review [2] and a specific limitation on federal-court jurisdiction.[3] By virtue of the provision just quoted, these limitations apply with respect to subchapter XVIII—the subject of this action—to the same extent that they apply with respect to subchapter II. Thus, the interpretation of section 405(h) is central to the determination whether plaintiffs may base jurisdiction here on either 28 U.S.C. § 1331(a) or 28 U.S.C. § 1361.

## STATUTORY CLAIM

■ Plaintiffs' principal claim is that defendants have misinterpreted section 1842(b)(5) of the Social Security Act. That provision, by its very terms, permits the assignment of Part B Medicare benefits to

---

**2.** The second sentence of section 405(h) reads as follows:

"No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided."

**3.** The third sentence of section 405(h) reads as follows:

"No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."

"the physician or other person who provided the service," and plaintiffs argue forcefully that NEMA is a person providing services within the meaning of section 1842(b)(5). But I may not resolve this question on the merits, for I believe that section 405(h) prevents me from exercising jurisdiction over this aspect of plaintiffs' case.

The second sentence of section 405(h) states that "[n]o findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided." Although Pennsylvania Blue Shield, rather than the Secretary, actually terminated the NEMA reassignment accounts, the facts recited above make it plain that the carrier took this action only because the Medicare Bureau had interpreted section 1842(b)(5) to preclude the assignment of benefits to NEMA. Under the circumstances, I believe that plaintiffs seek review of "a decision of the Secretary"—albeit an informal one—and that the second sentence of section 405(h), quoted above, must therefore be reckoned with.[4] *See generally* 42 U.S.C. § 405(*l*) (1976) (authorizing the Secretary to delegate his powers and duties); *id.*, § 1395ii (incorporating § 405(*l*) into subchapter XVIII).

The second sentence of section 405(h) precludes judicial review of the Secretary's decisions "except as herein provided." Section 405(h) appears in subchapter II, and the words "as herein provided" refer direct- ly to section 405(g), which provides for judicial review of certain decisions made by the Secretary. In the context of subchapter XVIII, however, those words must be read as a reference to the provisions *in subchapter XVIII* that authorize judicial review. Although subchapter XVIII contains several provisions that authorize judicial review of certain findings or decisions made by the Secretary, 42 U.S.C. §§ 1395ff, 1395*oo* (f) (1976), nothing in subchapter XVIII purports to authorize judicial review of a decision by the Secretary that a Part B claimant (such as NEMA) is not a person providing services within the meaning of section 1842(b)(5). In short, this is not a case where the plaintiff seeks to bypass the review mechanisms prescribed by Congress in the Social Security Act. Instead, plaintiffs invoke 28 U.S.C. § 1331 and 28 U.S.C. § 1361 only because the Social Security Act itself makes no provisions at all for judicial review of the decision that. has harmed them.[5]

Unfortunately, plaintiffs never squarely confront the broad, preclusive language of section 405(h). Their main jurisdictional argument is that the second sentence of section 405(h), quoted *supra*, is somehow inapplicable where jurisdiction is based on the mandamus statute, 28 U.S.C. § 1361 (1976). For the reasons set out below, I cannot accept this argument. Although some courts have entertained *constitutional* or *procedural* questions under section 1361 in

---

4. My conclusion that the second sentence of section 405(h) precludes the assumption of jurisdiction over plaintiffs' statutory claim makes it unnecessary for me to consider plaintiffs' contention that jurisdiction over that claim is *not* barred by the third sentence of section 405(h).

5. Plaintiffs could have obtained a hearing on Pennsylvania Blue Shield's decision to terminate the NEMA reassignment accounts. *See* 42 U.S.C. § 1395u(b)(3)(C) (1976); 42 C.F.R. §§ 405.801–.872 (1977). This hearing would have been held before a hearing officer designated by Pennsylvania Blue Shield, 42 C.F.R. § 405.823 (1977), and his decision would have been final, *id.*, § 405.835, unless reopened by him or by Pennsylvania Blue Shield in accord- ance with § 405.841. *See generally Davis v. United States Dep't of HEW*, 416 F.Supp. ,448 (S.D.N.Y.1976) (rejecting due process challenge to the hearing procedures). Plaintiffs apparently have not sought such a hearing, for rather obvious reasons. They seek review of a decision, implemented by the carrier, that was based entirely on defendants' interpretation of the law. Defendants, and not the carrier, are charged with interpreting the statute, and a hearing officer designated by the carrier would have no authority to supersede defendants' decision that § 1842(b)(5) bars the reassignment of benefits to NEMA. *See* 42 C.F.R. § 405.-1829(a) (1976). Indeed, defendant Katz suggested as much in the last paragraph of his February 2, 1979 letter to plaintiffs' counsel, quoted *supra*.

the face of section 405(h),[6] and although the cases dealing with section 1361 in the context of the Social Security Act are certainly confused,[7] section 405(h) does not simply dissolve whenever an aggrieved claimant invokes the mandamus statute.

I see nothing in this case that warrants an "exception" to the rule of section 405(h). Plaintiffs raise, in the main, an issue of statutory interpretation, and they seek a declaration that defendants have misinterpreted the statute. Such a declaration, of course, would remove the only obstacle that now prevents plaintiffs from receiving assigned benefits. In short, this action resembles many actions challenging *regulations* adopted by the Secretary that restricted, in various ways, the amount of reimbursement that health-service providers could receive. Jurisdiction over such challenges to regulations has generally been found to be precluded by section 405(h).[8] Although those cases turn on the *third* sentence of section 405(h), quoted *supra* note 3, and are therefore not directly controlling here, they demonstrate that section 405(h) effectively precludes jurisdiction over many actions seeking review of the Secretary's interpretation of the Social Security Act. Thus, the absence from subchapter XVIII of any authorization for the instant lawsuit is scarcely a good reason to base jurisdiction on the mandamus statute, in the face of section 405(h). On the contrary, the second sentence of that section means, in this context, that defendants' decision is reviewable as provided in subchapter XVIII "or not at all." *Califano v. Sanders,* 430 U.S. 99, 110, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (Stewart, J., concurring in the judgment).

Nor can I accept the suggestion—implicit in plaintiffs' brief—that mandamus actions in general are so different from other types of challenges to the Secretary's interpretations that they should be exempted from the operation of section 405(h). True, plaintiffs here allege that the defendants' reading of section 1842(b)(5) is clearly inconsistent with the plain meaning of that provision. *All* mandamus plaintiffs are expected to plead legal conclusions like this if they seek to base jurisdiction on section 1361. *See, e. g., Cervase v. Office of Fed. Register,* 580 F.2d 1166, 1174–76 & n.12 (3d Cir. 1978) (Garth, J., dissenting); *Mattern v. Weinberger,* 519 F.2d 150, 155–57 & n.13 (3d Cir. 1975), *vacated on other grounds and remanded sub nom. Mathews v. Mattern,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976). But I see no reason why the preclusive effect of section 405(h) should turn on whether the Secretary's error is alleged to be clear, on the one hand, or subtle, on the other. To permit review under section 1361 of alleged "clear" errors in statutory interpretation would be to rewrite the second sentence of section 405(h) so as to exclude mandamus actions. Such an approach runs counter to the plain language of that sentence, quoted *supra* note 2. *See Califano v. Sanders,* 430 U.S. 99, 109–11, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (Stewart, J., concurring in the judgment). And even if such an approach were supported by substantial policy considerations, federal judges nevertheless ought not to "imply jurisdiction because we think it ought to exist where Congress has literally given none." *Dr. John T. MacDonald Foundation, Inc. v. Mathews,* 554 F.2d 714, 719 (5th Cir. 1977) (Clark, J., dissenting), *vacated sub nom. Dr.*

**6.** *See, e. g., Elliott v. Weinberger,* 564 F.2d 1219, 1225–28 & n.9 (9th Cir. 1977), *cert. granted sub nom. Califano v. Elliott,* 439 U.S. 816, 99 S.Ct. 75, 58 L.Ed.2d 106 (1978); *White v. Mathews,* 559 F.2d 852, 855–56 (2d Cir. 1977); discussion *infra.*

**7.** *Compare John Muir Mem. Hosp., Inc. v. Califano,* 457 F.Supp. 848, 857 (N.D.Cal.1978) ("In most instances . . . the courts have included [§ 1361] within the statutory bars of § 405(h).") *with Caswell v. Califano,* 435 F.Supp. 127, 132–33 (D.Me.1977) ("lower federal courts confronted with analogous cases arising under the Social Security Act have consistently found mandamus jurisdiction to be present"), *aff'd on other grounds,* 583 F.2d 9 (1st Cir. 1978).

**8.** *See, e. g., Humana of South Carolina, Inc. v. Califano,* 191 U.S.App.D.C. 368, 590 F.2d 1070 (1978); *American Ass'n of Councils of Medical Staffs v. Califano,* 575 F.2d 1367 (5th Cir. 1978), *cert. denied,* 439 U.S. ——, 99 S.Ct. 1018, 59 L.Ed.2d 72 (1979).

*John T. MacDonald Foundation, Inc. v. Califano,* 571 F.2d 328 (5th Cir. 1978) (en banc), *cert. denied,* 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). Accordingly, I conclude that defendants' motion to dismiss the complaint for lack of subject-matter jurisdiction should be granted with respect to plaintiffs' statutory claim.

## CONSTITUTIONAL CLAIM

Plaintiffs also assert a constitutional deficiency in defendants' actions vis-a-vis the NEMA reassignment accounts. This contention is set forth in their brief as follows:

> "Through their relationship with Medicare since 1976, plaintiffs' rights to continue this relationship have risen to a statutory entitlement as set forth in *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1969) . . . . Plaintiffs, therefore, are entitled to procedural due process prior to their termination. The procedural due process mandated under *Goldberg v. Kelly,* supra, has been denied to plaintiffs.

> Plaintiffs have not received, but seek, a pretermination evidentiary hearing, timely and adequate notice of such hearing, and an effective opportunity to defend by confronting adverse witnesses and by presenting their arguments and evidence orally before an impartial decision maker. *Goldberg v. Kelly,* supra."

Plaintiffs' Memorandum of Law (Document No. 5) at 19.

■ The threshold question, once again, is whether I may assume jurisdiction over this claim based on either 28 U.S.C. § 1331 or 28 U.S.C. § 1361. So far as logic and statutory construction are concerned, the foregoing discussion with respect to plaintiffs' *statutory* claim would dictate that jurisdiction is again lacking. But a different result is required here, for two separate reasons. First, the availability of judicial review is presumed where a constitutional question is asserted. Second, plaintiffs challenge the procedure(s) employed by the Secretary, rather than the merits of his decision. Both of these considerations suggest that section 405(h) does not preclude

jurisdiction over this portion of plaintiffs' case.

As the First Circuit recently observed, "courts have hesitated to read [*Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)] and § 405(h) to foreclose all avenues of judicial review when the [Social Security] Act provides for *no* administrative process leading to judicial review and constitutional questions are at issue." *Rhode Island Hosp. v. Califano,* 585 F.2d 1153, 1157 (1st Cir. 1978) (emphasis in original) (citations omitted). This hesitation stems from the notion that it would be "extraordinary," *Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975), for Congress to effectively insulate a statutory program from constitutional challenge by curtailing federal-court jurisdiction, so that " 'clear and convincing' evidence would be required," *id.* (quoting *Johnson v. Robison,* 415 U.S. 361, 373, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)), for a court to find that Congress intended such a result. And once a court concluded that Congress *did* seek to foreclose all judicial review, "a serious constitutional question of the validity of the statute as so construed" would then arise. 422 U.S. at 762, 95 S.Ct. at 2465. *See generally* Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv.L.Rev. 1362 (1953). These considerations led the Ninth Circuit to emphasize "[t]he distinction between due process questions divorced from a claim for benefits and [non-constitutional] questions related to the merits of a benefits claim." *Elliott v. Weinberger,* 564 F.2d 1219, 1226 & n.9 (9th Cir. 1977), *cert. granted sub nom. Califano v. Elliott,* 439 U.S. 816, 99 S.Ct. 75, 58 L.Ed.2d 106 (1978).

■ Another line of cases has carved out an even broader "exception" to the preclusive language of section 405(h). These cases focus on whether the alleged deficiency in the Secretary's actions is substantive or procedural. Where a claimant attacks the *merits* of the Secretary's decision, section 405(h) applies in full force. But "when suit is brought simply to vindicate an inter-

est in procedural regularity," that provision "is not summoned into play." *Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1080 (D.C.Cir.1978) (footnote omitted); *see* cases collected *id.* n.76. The claimant may argue, as plaintiffs do here, that the due process clause mandated certain procedures before the Secretary took the challenged action. But so long as the alleged deficiency is procedural, rather than substantive, the claimant need not rely on the Constitution. *See, e. g., White v. Mathews,* 559 F.2d 852, 856 (2d Cir. 1977). Thus, one district judge exercised jurisdiction under section 1361 in a case where applicants for disability insurance benefits claimed that both the due process clause and the Social Security Act entitled them to reasonably prompt hearings on their applications. *See Caswell v. Califano,* 435 F.Supp. 127, 132–33 (D.Me.1977) (alternative holding), *aff'd on other grounds,* 583 F.2d 9 (1st Cir. 1978). And the Court of Appeals for the D.C. Circuit recently found section 405(h) inapplicable to a procedural challenge grounded solely in the Administrative Procedure Act. *See Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070 (D.C.Cir.1978). The claimant there argued that the Secretary, in adopting a regulation limiting reimbursement of certain Medicare providers, "failed to adhere to the methodology generally applicable to any rulemaking effort." *Id.* at 1080. That contention, in the court's view, fell "outside the purview" of section 405(h). *Id.*

■ The challenge that plaintiffs raise here—the argument that they should have been afforded a prior evidentiary hearing before the Secretary (or his delegates) took action that affected them—comes within both of these "exceptions" to section 405(h). Plaintiffs advance a constitutional deficiency in the Secretary's actions, and they challenge those actions on procedural grounds that are entirely distinct from the merits of the underlying issue of statutory interpretation. Under the circumstances, I conclude that section 405(h) does not bar the assumption of jurisdiction over this portion of plaintiffs' case. Specifically, I find at this time that 28 U.S.C. § 1331 provides a basis for jurisdiction. Accordingly, defendants' motion to dismiss the complaint will be denied with respect to this aspect of the case, and I shall turn now to the merits of plaintiffs' contention.

Plaintiffs urge that they were deprived of "property" without procedural due process when defendants determined, without affording plaintiffs a prior evidentiary hearing, that section 1842(b)(5) of the Social Security Act bars the assignment of benefits to the corporate plaintiffs. A review of the complaint and the motion papers filed by plaintiffs reveals that they seek declaratory (and perhaps injunctive) relief from this allegedly unconstitutional action taken by defendants. As the following brief discussion should demonstrate, however, defendants are entitled to summary judgment on two alternative grounds: (1) their actions did not deprive the corporate plaintiffs of any "property" interest encompassed by the fifth amendment's due process clause, and (2) even assuming the existence of a "property" interest, plaintiffs were afforded the minimal procedures required by the due process clause in this context.

■ To begin with, the corporate plaintiffs' ability to receive reassigned Medicare Part B benefits does not amount to a "property" interest. The First Circuit recently reached this very issue in a slightly different factual context, and part of its discussion bears quotation here:

"The Medicare Part B program is nothing more than a governmental insurance program for the aged. As such the real parties in interest are the beneficiaries; physicians are parties in interest only as assignees of the beneficiaries. Unlike the welfare benefits of *Goldberg v. Kelly,* which were 'a matter of statutory entitlement for persons qualified to receive them,' 397 U.S. at 262, 90 S.Ct. at 1017, physicians do not have a protectable property interest in their continuing eligibility to bill for reimbursement under Part B. If services rendered by a physician are disentitled from Part B eligibility, the

physician can either not perform the services or bill the patient directly."

*Cervoni v. Secretary of HEW,* 581 F.2d 1010, 1018 (1st Cir. 1978).

In addition to the two alternatives just mentioned—ceasing to provide services or billing patients directly—the corporate plaintiffs here apparently have a third option. They can arrange to have their Medicare patients assign benefits to the individual physicians who actually perform the services, and they can then recover from those physicians any amount in excess of the compensation specified in their agreements with the physicians. Thus, the termination of the NEMA reassignment accounts did not deprive the corporate plaintiffs of any "property" interest.

Defendants' actions have obviously disrupted plaintiffs' financial arrangements with both (1) the hospitals whose emergency rooms they staff and (2) the physicians who actually perform the emergency-room services. As I have already noted, however, plaintiffs had no "property" interest in their ability to receive assigned benefits. Thus, although plaintiffs may have undertaken various contractual obligations on the assumption that they would remain eligible for assignments, the disruption of those contractual arrangements did not deprive plaintiffs of "property" encompassed by the due process clause of the fifth amendment.

■  Alternatively, even if plaintiffs were deprived of "property" by defendants' actions, it by no means follows that they should have been afforded a prior evidentiary hearing. Due process mandates a trial-type evidentiary hearing *only* where so-called "adjudicative facts" are in dispute. *See generally* Advisory Committee Note to Fed.R.Evid. 201(a), 56 F.R.D. 183, 201–04 (1972) (reviewing the distinction between adjudicative facts and legislative facts). On the record here, however, it is clear that no adjudicative facts were in dispute. Defendants initially directed Pennsylvania Blue Shield to terminate the NEMA accounts when they determined that the emergency-room physicians were independent contractors, rather than NEMA em-

ployees. That determination was based in large part on information supplied by NEMA, and plaintiffs have never suggested that the physicians were actually employees of NEMA. When plaintiffs' counsel wrote to defendant Katz, suggesting that the corporate plaintiffs could receive assigned benefits *even though* they did not employ the emergency-room physicians, Katz advised him (in the letter quoted earlier) that NEMA was not a person providing services within the meaning of section 1842(b)(5) of the Act. That determination was precisely the statutory interpretation that plaintiffs challenge here. As Katz' letter reveals, it was based on his understanding of the congressional intent. Katz also had the benefit of the three-page letter written by plaintiffs' counsel, which described the arrangements among the corporate plaintiffs, the emergency-room physicians, and the hospitals. Exhibit F to Complaint (Document No. 1). Plaintiffs have never suggested that Katz lacked an understanding of these arrangements, or that other adjudicative facts bearing on his interpretation of the Act should have been adduced. What plaintiffs apparently wished to present at a hearing were *legislative* facts, such as the role of corporate or group practices in assuring high-quality emergency-room care in all hospitals. As I noted earlier, however, an evidentiary hearing need only be provided where adjudicative facts are at issue. Thus, due process certainly did not require such a hearing in this case.

■  Where legislative facts are at issue, though, due process may require some procedures short of an evidentiary hearing. *See FCC v. WJR, The Goodwill Station, Inc.,* 337 U.S. 265, 267, 271–77, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949). Thus, it is possible that plaintiffs were denied due process here, even though they were not entitled to an evidentiary hearing. A review of the record, however, leads me to conclude that plaintiffs were afforded sufficient procedural protection to satisfy the demands of due process in this context.

■  As I noted earlier, the initial determination by Pennsylvania Blue Shield that

NEMA did not employ the emergency-room physicians was based in large part on information supplied by NEMA. In November of 1978, plaintiff Caskey was advised that Pennsylvania Blue Shield would terminate the NEMA reassignment accounts for this very reason. Plaintiffs conceded the lack of an employer-employee relationship, but their attorney wrote to defendant Katz on January 2, 1979 and argued that the NEMA accounts were nevertheless proper because NEMA was a person providing services, within the meaning of section 1842(b)(5). Katz replied by letter dated February 2, 1979, stating (apparently on behalf of the Medicare Bureau) that NEMA was *not* a person providing services within that provision. In his letter, which I quoted earlier in this opinion, Katz explained this interpretation by reference to (1) the overall scheme of the Medicare statute, and (2) the relative recency of medical professional corporations. Plaintiffs filed this complaint on February 13. Pennsylvania Blue Shield wrote to plaintiff Caskey on February 14, advising him that the reassignment accounts would be terminated on February 22, although in fact they were not terminated until March 26.

Thus, plaintiffs received prior notice of the termination and a statement of reasons from Pennsylvania Blue Shield. Through counsel, plaintiffs then submitted written arguments to defendant Katz in support of their position that the reassignment accounts were proper under their interpretation of the Act. In response, plaintiffs received another statement of reasons—legal reasons, this time—why the accounts would be terminated. All this took place well before the termination occurred. True, plaintiffs developed further arguments, based on legislative facts, suggesting that the Medicare Bureau had misinterpreted the law by finding that NEMA was not a person providing services. (Those arguments are set forth in plaintiffs' memorandum of law.) These arguments were never presented to defendants. But nothing in the record suggests that defendants in any way discouraged their submission. Although defendant Katz noted in his letter

that the Act gave plaintiffs no right of appeal to the Secretary, plaintiffs' counsel presumably could have submitted additional written materials to defendant Katz in an effort to persuade him (and the Medicare Bureau) that he had misinterpreted the statute. Instead, counsel filed this complaint on February 13, 1979.

In short, proceeding on the assumption that plaintiffs were deprived of a "property" interest when the NEMA accounts were terminated, and bearing in mind that plaintiffs sought additional opportunities to present *legislative* facts, I cannot say that they were denied any procedural protection required in this context as a matter of due process. The procedures employed here were unquestionably somewhat informal, but that does not make them constitutionally deficient. *Cf., e. g., Goss v. Lopez,* 419 U.S. 565, 584, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (due process requires "at least an informal give-and-take between student and disciplinarian" in connection with brief suspension from school). The most noteworthy omission here—the lack of opportunity for oral argument—did not prevent plaintiffs from effectively presenting their position. Thus, I simply cannot say that plaintiffs were denied procedural due process here. *See, e. g., Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (due process requires only procedures "tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case") (quoting *Goldberg v. Kelly,* 397 U.S 254, 268–69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)).

In view of my conclusions (1) that plaintiffs had no "property" interest in their asserted right to receive assigned benefits, and (2) that, in any event, plaintiffs were not denied procedural due process when the reassignment accounts were terminated without more extensive procedures, I find that defendants are entitled to summary judgment in their favor on plaintiffs' constitutional claim.