39 F.3d 940
 GTE CALIFORNIA, INC., Petitioner,
Pacific Bell; Nevada Bell; National Cable Television
Association, Inc. ("NCTA"); Pacific Telesis
Group, Intervenors,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
California Cable Television Association; National Cable
Television Association, Inc., Respondents-Intervenors.
 No. 93-70924.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 12, 1994.
Decided Oct. 31, 1994.
 
 Roy T. Englert, Jr., Michael McConnell, Mayer, Brown & Platt, Washington, DC, for petitioner.
 Douglas Letter, U.S. Dept. of Justice, Washington, DC, for respondents.
 Michael K. Kellogg, Kellogg, Huber & Hansen, Washington, DC, for intervenors Pacific Telesis Group, Pacific Bell and Nevada Bell.
 Michael S. Schooler, Dow, Lohnes & Alberson, and Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, for respondent-intervenors California Cable Television Ass'n and Nat. Cable Television Ass'n, Inc.
 Petition to Review a Decision of the Federal Communications Commission.
 Before: FERGUSON, NOONAN, and T.G. NELSON, Circuit Judges.
 Opinion by Judge T.G. NELSON; Dissent by Judge NOONAN.
 T.G. NELSON, Circuit Judge:
 
 I.
 OVERVIEW
 
 1
 In 1970, the Federal Communications Commission (FCC or Commission) issued rules prohibiting local telephone common carriers from providing cable television service in the area in which they controlled the local exchange.[1]
 
 
 2
 In 1984, Congress amended the Communications Act by adopting what is now codified in 47 U.S.C. Sec. 533(b). This section was modeled after the FCC rules and prohibits a telephone company from "provid[ing] video programming directly to subscribers in its telephone service area." Id. Video programming is defined as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. Sec. 522(19).
 
 
 3
 In this case, a local telephone carrier which had received a Commission waiver of the restrictions of the Commission's rules and Section 533(b) raises a facial and "as applied" constitutional challenge to Section 533(b) on the basis that preventing local telephone carriers from carrying television programming violates their First Amendment rights as a content-based regulation of speech. For the reasons stated in the opinion, we hold the case is moot and dismiss the petition for review of the FCC's order rescinding the waiver, which expired on July 17, 1994.
 
 II.
 FACTS AND PROCEDURAL HISTORY
 
 4
 In 1987, the City of Cerritos, California, awarded Apollo Cablevision, Inc. (Apollo) a fifteen-year franchise to construct, operate and maintain an underground cable television system within the City. Apollo's plan contemplated that GTE California, Inc. (GTECA), the local telephone common carrier, would construct and operate systems of coaxial cable and fiber optic cable, leasing half of the coaxial cable capacity to Apollo to provide cable service within the City. As a further element of the plan, the proposed fiber optic facilities and the other half of the coaxial facilities were to be leased to GTECA's affiliate, GTE Service Corporation, for testing the capabilities of the system to provide various elements of advanced service to consumers as well as comparative testing of technologies. The City selected Apollo's corporate parent, T.L. Robak, Inc. (Robak), to do the construction by contract with GTECA.
 
 
 5
 GTECA first took the coaxial application to the Commission for authority pursuant to Section 214 of the Communications Act of 1934. The application was considered by the Common Carrier Bureau of the Commission. 3 FCC Rcd 2317. The Bureau determined that the relationship among Robak, Apollo and GTECA violated the Commission's "affiliation" rules because it determined that GTECA's construction contract with Robak must be imputed to Apollo.[2] Id. at 2319. However, the Bureau determined that a waiver was appropriate under the Act, finding that the City would not be able to acquire its cable video programming service unless provided by Apollo through affiliation with GTECA. Id. at 2323. GTECA's application was opposed before the Bureau by the California Cable Television Association (CCTA) and the National Cable Television Association, Inc. (NCTA), both of which participated throughout the administrative proceedings and have intervened in this court.
 
 
 6
 When CCTA and NCTA petitioned the FCC for review of the Bureau's decision, the Commission consolidated the coaxial application with a separate application filed by GTECA to construct, operate and maintain the fiber optic portion of the project. The Commission approved both section 214 applications and granted a waiver of the cross-ownership restrictions contained in section 533(b) pursuant to the waiver authority granted in section 533(b)(4). 4 FCC Rcd 5693. The Commission found that the waiver was in the public interest given the totality of the circumstances, but imposed several conditions, including a five-year time limit, noting that GTECA would be free to seek another waiver if it was needed to continue testing. Id. at 5700. The Commission did not discuss the activities of Robak in conjunction with the finding of good cause for the waiver.
 
 
 7
 NCTA petitioned the D.C. Circuit to review the Commission order. That court focused on the participation by Robak and held that the Commission had failed to delineate the particular circumstances supporting the waiver, as required by 47 U.S.C. Sec. 533(b)(4). National Cable Television Ass'n v. FCC, 914 F.2d 285, 289 (D.C.Cir.1990). The court said, speaking of the Robak participation:
 
 
 8
 The Commission, however, has failed in its obligation to explain why the advantages to be derived from General's application cannot be realized in the absence of a waiver, because it has not indicated why the use of Robak for design and construction was necessary to the proposal. Obviously, absent such a reason, the choice of another unrelated contractor would have eliminated the General-Apollo affiliation, and, with it, the cross-ownership problem.
 
 
 9
 Id.
 
 
 10
 Apparently, the D.C. Circuit was under the impression that the only reason for a waiver was the participation by Robak. The fact that GTECA proposed to provide video programming within its service area, which comes within the ownership restrictions of Section 533(b), was not discussed by the D.C. Circuit.
 
 
 11
 On remand, the Commission worked informally with the parties in an attempt to settle the dispute but was ultimately unsuccessful. Therefore, it issued an order, pursuant to the mandate of the D.C. Circuit, in which it rescinded the waiver:
 
 
 12
 On the basis of the record before us, we simply are unable to find that Robak's participation satisfies the controlling standard as articulated by the court. We conclude that a waiver of the rules permitting Robak's involvement is not justified.
 
 
 13
 8 FCC Rcd 8181 (footnote omitted).
 
 
 14
 The Commission reaffirmed its original findings regarding the substantial public benefits to be gained from the technical and market trials in Cerritos. Id. at 8182. It held that justification of one aspect of the original waiver did not relieve GTECA of "its obligation to satisfy the governing legal standard with respect to all aspects of the waiver." Id. The Commission therefore rescinded "the temporary, conditional rule waiver and associated Section 214 authorizations" effective 120 days from the date of the decision. Id.
 
 
 15
 GTECA moved the Commission to stay the effect of its order pending a petition for review to this court and for the first time raised its claim that the statute excluding local telephone companies from engaging in video programming within their service area is a violation of the First Amendment as a content-based restriction on speech. The Commission denied the application for stay on December 3, 1993, and noted that the constitutional issue had not been raised in time for the Commission to address the constitutional issue in detail, but did state its view that the "telephone company/cable television cross-ownership prohibition constitutes structural regulation of the telecommunications marketplace that is fully consistent with the First Amendment."
 
 
 16
 GTECA petitioned this court for review. Pacific Telesis Group, Pacific Bell and Nevada Bell were permitted to intervene as petitioners pursuant to Fed.R.App.P. 15(d). This court entered an order staying the Commission's order of rescission.
 
 III.
 DISCUSSION
 A. Scope of Authority Granted by FCC
 
 17
 There is a substantial question whether this case is moot, due to the expiration of the FCC waiver on July 17, 1994. GTECA contends that the case is not moot because it was granted "permanent section 214 authority" which was unaffected by the FCC's rescission of the waiver. Therefore, we must first address the scope of the FCC's grant of authority pursuant to section 214.
 
 
 18
 GTECA's first application to the Commission was for authority to construct and maintain the coaxial cable facilities in Cerritos. This was the subject of the Common Carrier Bureau's order of April 12, 1988, which granted a waiver from the Commission's rules due to the involvement of Robak. 3 FCC Rcd 2317.
 
 
 19
 The challenges to the Bureau order by representatives of the cable industry were consolidated before the FCC with GTECA's separate application to construct, operate and maintain the fiber optic system. This consolidated proceeding generated the order of July 17, 1989, which was appealed to the D.C. Circuit. 4 FCC Rcd 5693.
 
 
 20
 In the summary of its action, the Commission said, "We conclude that the totality of circumstances surrounding General's Cerritos project, including the public interest benefits of its coaxial cable, its fiber optic facility and its comparative technical and marketing testing program, constitutes good cause to waive the ... rules...." Id.
 
 
 21
 In describing the conditions it placed on its grant of authority, the FCC said, "[w]e limit our good cause waiver for General's Cerritos project to a five-year period.... At the end of that time, General's waiver will expire, but General would be free to seek another waiver if it needs to continue testing." Id. at 5700 (footnote omitted). GTECA had told the Bureau that if it did not gain approval of the coaxial system, it would not construct the fiber optic system. 3 FCC Rcd at 2320. Thus, both GTECA and the Commission understood "General's Cerritos project" to be the entirety of the facilities to be built and operated by GTECA in Cerritos. The unitary purpose was acknowledged by the Commission when it said: "The grant of a waiver for good cause permits us to grant the Section 214 coaxial cable and fiber optic cable applications for General's Cerritos project." 4 FCC Rcd at 5700 (footnote omitted).
 
 
 22
 GTECA argues in its supplemental brief that it received two authorizations--one a grant of section 214 authority, and the other "a waiver of the rules prohibiting telephone companies (or their affiliates) from engaging in video programming." Only the waiver was to expire in five years, and therefore, GTECA contends, the section 214 authority must continue.
 
 
 23
 GTECA's argument points out the limits of the decision we must make. It is the provisions of the Act restricting local telephone companies from engaging in video programming which GTECA challenges here.[3] The provisions of the Act which permit those companies to carry signals for others, such as Apollo, are not challenged here. More to the point is the fact that GTECA needed no waiver of the restrictions on engaging in video programming in order to carry Apollo's signals. Because the "permanent" authority, if there is any, to carry signals for Apollo is not an issue here, we need not decide if any such authority exists. We need only determine whether the authority for which the waiver was required, i.e., video programming, expired with the waiver.
 
 
 24
 In its order of December 6, 1993, denying GTECA's motion for stay of its November 9, 1993 order, the Commission noted an earlier warning by the Bureau in denying a stay of its order, that a reversal of the Bureau's order could require dismantling of the partly constructed facilities. The Commission noted GTECA's acceptance of this risk in its order of July 17, 1989. 4 FCC Rcd at 5696. If permanent video programming authority had been contemplated by the parties, including GTECA, there would have been no necessity of dismantling the facilities encompassed by that authority.
 
 
 25
 There is the further factor that the statutory provisions which prohibited GTECA from engaging in video programming would continue to exist at the end of the five-year period, so far as anyone knew in 1989. Absent the FCC waiver, there would have been no video programming authority at all. GTECA's argument attempts to convert the five-year waiver into a permanent waiver and is simply not tenable, given the structure of the statute and the Commission's language in its 1989 order.
 
 
 26
 Therefore, we hold that GTECA was not granted permanent section 214 authority to engage in video programming by the FCC. All of its video programming authority was subject to the five-year term of the waiver, and none survived expiration of waiver on July 17, 1994. We express no opinion on whether GTECA had or has permanent section 214 authority to carry Apollo's signals, as no issues relating to that question are properly before us.
 
 
 27
 During the pendency of this appeal, GTECA transmitted two tariffs to the FCC encompassing its Cerritos operations. The Common Carrier Bureau addressed the transmittals in an order dated July 14, 1994. GTECA contends that the Bureau's July 14 order extended the waiver until at least September 12, 1994. We disagree.
 
 
 28
 The Bureau's July 14 order granted interim section 214 authority to provide video channel service and also to provide service to its affiliate. It then granted "a limited waiver of the cross-ownership waiver and Section 214 authorization for a period of 60 days...." It also rejected the City's request to extend GTECA's 1989 waiver. It is clear that the July 14 waiver is a stand-alone action of the Bureau, not an extension of the original waiver.
 
 B. Mootness
 
 29
 If the FCC decision to rescind the waiver had not intervened, then the waiver and GTECA's section 214 video programming authority would have ceased to exist by its own terms on July 17, 1994. GTECA had not applied for an extension prior to the Commission's action; nor has it applied for a new waiver. Under these circumstances, there is no substantial question now before us. Our stay order only addressed the Commission's order of rescission. It did not extend the life of the waiver, nor has this court or the FCC been asked to do so.
 
 
 30
 The jurisdiction of federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. "To satisfy the Article III case-or-controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 375, 78 L.Ed.2d 58 (1983) (per curiam); see also Pomerantz v. County of Los Angeles, 674 F.2d 1288, 1291 (9th Cir.1982) ("The only constitutional mootness question is whether a live controversy remains at the time this court reviews the case." (internal quotations and brackets omitted).) "Where events have occurred that prevent us from granting effective relief, we lack jurisdiction and must dismiss the appeal." Enrico's, Inc. v. Rice, 730 F.2d 1250, 1254 (9th Cir.1984); see also United States v. Alder Creek Water Co., 823 F.2d 343, 345 (9th Cir.1987).
 
 
 31
 The conditions of the original waiver ultimately terminated GTECA's rights, not the Commission's order rescinding the authority granted. Thus, we have no way to give GTECA relief from the real cause of its "injury," which was the five-year waiver term. Simply vacating the Commission's December, 1993 order would not give GTECA any relief because the waiver has expired.
 
 
 32
 GTECA says in its reply brief that "[t]he constitutionality of Section 533(b) is an important question, which should be resolved." We assume that GTECA is referring to the exception to the mootness doctrine which permits courts to review discontinued or expired official conduct on the basis that the acts are "capable of repetition, yet evading review." Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). This exception applies only "in exceptional circumstances, such as where the challenged action is too brief ever to be fully litigated prior to its cessation and where it can be shown that there is a reasonable expectation that plaintiff will again be subjected to the allegedly wrongful activity." Enrico's, Inc., 730 F.2d at 1254 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983)); see also Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348-49, 46 L.Ed.2d 350 (1975) (per curiam); Headwaters, Inc. v. Bureau of Land Management, 893 F.2d 1012, 1016 (9th Cir.1989). "That other persons may litigate a similar claim does not save a case from mootness."[4] Funbus Sys., Inc. v. State of Cal. Public Utils. Comm'n, 801 F.2d 1120, 1131 (9th Cir.1986).
 
 
 33
 Because the Commission has no power to declare Section 533(b) unconstitutional (see Johnson v. Robison, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974)) we can assume it will continue to require telephone companies to comply with it. But it is not necessarily a reasonable expectation that GTECA would again be subjected to the same allegedly wrongful action. See Weinstein, 423 U.S. at 149, 96 S.Ct. at 349 (discussing Southern Pac. Terminal Co., 219 U.S. 498, 31 S.Ct. 279, and observing that "the same party would in all probability be subject to the same kind of order in the future").
 
 
 34
 This case also presents a serious question of exhaustion because GTECA did not present the constitutional issue to the Commission at a point in the proceedings where it could have tried to obviate the constitutional question by granting discretionary relief, such as a permanent waiver. Our decision that the case is moot means we need not reach that issue. But our review of the question left us with the distinct impression that the Commission is very receptive to the value to the public of what GTECA has been doing in Cerritos. It would not necessarily have been futile for GTECA to raise the constitutional issue before the Commission, and may not be futile for GTECA to try again.[5]
 
 
 35
 Whether prudential or constitutional, mootness analysis must be addressed to the case before the court. "The basic question is whether there exists a present controversy as to which effective relief can be granted." People of Village of Gambell v. Babbitt, 999 F.2d 403, 406 (9th Cir.1993) (internal quotation omitted). Here, we simply can give GTECA no relief, and there is no need to use this case as a vehicle for review of the FCC action. GTECA has filed tariffs with the Commission to enable it to continue the operation of the Cerritos facilities. The Commission's response to these filings will furnish GTECA a direct opportunity to challenge the constitutionality of the statute.[6] This opportunity is sufficient to warrant our abstaining from deciding a moot case. See American Horse Protection Ass'n, Inc. v. Watt, 679 F.2d 150, 151 (9th Cir.1982); see also Headwaters, Inc., 893 F.2d at 1016. Thus, even assuming a repetition, it would not evade review. See id. Therefore, we are not presented with the exceptional situation sufficient to avoid mootness. See Headwaters, 893 F.2d at 1016 (not exceptional situation); cf. Greenpeace Action v. Franklin, 14 F.3d 1324, 1329-30 (9th Cir.1992) (extraordinary case capable of repetition, yet evading review).
 
 
 36
 We do not agree with intervenors Pacific Telesis Group, Pacific Bell and Nevada Bell that their arguments obviate the mootness problem in this case. Although "there are instances when an intervenor's claim does not rise and fall with the claim of the original party," United States Steel v. Environmental Protection Agency, 614 F.2d 843, 845 (3d Cir.1979), this is not one of them. The intervenors' brief, filed "in support of" GTECA, explains that they sought leave to participate because "resolution of the First Amendment issues raised by GTECA may delimit the future boundaries of the marketplace of ideas in all California and Nevada." Intervenors sought to protect their interests to the extent that the First Amendment issues were resolved. However, GTECA's case is moot, and as intervenors said in their moving papers, this case remains "an ordinary application for a discrete statutory waiver that would inure solely to the benefit of GTECA in the City of Cerritos." We will not convert the intervenors' attempt to protect their interests in the event that this case turned on the First Amendment issues into a broad-based First Amendment challenge to section 533(b).
 
 
 37
 Benavidez v. Fong Eu, 34 F.3d 825 (9th Cir.1994), which involved alleged violations of the 1965 Voting Rights Act, does not compel a contrary result. Benavidez held that an intervening party may continue to litigate after the original party has been dismissed, where an independent basis for jurisdiction exists and unnecessary delay would otherwise result. 34 F.3d at 830-31. "[A] court has discretion to treat the pleading of an intervenor as a separate action in order that it might adjudicate the claims raised by the intervenor." Id. at 830 (quoting Fuller v. Volk, 351 F.2d 323, 328-29 (3d Cir.1965)). It is easy to see why such a rule would be adopted in a case in which the intervenors had filed a motion to intervene and a complaint in intervention in the district court and in which the district court did not identify the basis for dismissal of the complaint in intervention. See id. at 828, 828-29, 830, 830-31. It is not so easy to see why we should adjudicate the intervenors' First Amendment claims in this review proceeding, where those intervenors did not participate in the FCC proceedings and the original participant's petition is now moot.
 
 
 38
 The fact that the U.S. District Court for the Northern District of California stayed the proceeding in Pacific Telesis Group's action against the United States does not affect the outcome of this case. The government quite properly represented to the district court that resolution of the First Amendment issue in this review proceeding would likely control the district court action. However, as we have explained, the First Amendment question is not properly before us. Pacific Telesis Group will have its day in court, as its district court case is still pending, even though stayed. As for Pacific Bell and Nevada Bell, there is no question about the ultimate review of this constitutional question. See supra p. 13194 n. 4.
 
 
 39
 The point of the exercise throughout has been to get cable television service to the residents of the City of Cerritos, with added benefits of technical and marketing studies to GTECA and the industry. Perhaps the old drawings are the place to begin anew.
 
 
 40
 PETITION FOR REVIEW DISMISSED.
 
 NOONAN, Circuit Judge, dissenting:
 
 41
 The court, by judicial legerdemain, has converted a live case, in which four telephone companies challenge an act of Congress severely and irrationally restricting their freedom of speech, into a dead case in which there is no issue before the court. Instead of exercising a federal court's virtually unflagging obligation to exercise its jurisdiction, this court carefully refuses to examine the controversy put before it for decision. Instead of enforcing the Constitution of the United States, this court says that some other court, some other day, can do the job. The decision is incompatible with our duty as federal judges and wrong in its analysis of the case presented, for two reasons. First, GTECA's authority to carry a signal in Cerritos has not expired. Second, Pacific Telesis Group, Pacific Bell, and Nevada Bell, intervenors, have claims before the court unmooted by the expiration of GTECA's license. In what follows I will enlarge on these reasons and then address the merits of the controversy that so vigorously and visibly is pressed upon us for resolution.
 
 
 42
 First. The FCC, in the order appealed by GTECA, commanded that GTECA "SHALL COME INTO COMPLIANCE with the telephone company/cable television cross-ownership restriction within 120 days from the date this decision is released." This order is resisted by GTECA on the ground that it is already in compliance with all that can be constitutionally required of it. The FCC asserts that GTECA no longer has any authority to maintain cable facilities in Cerritos. The controversy is live and palpable.
 
 
 43
 The court in the majority opinion misconceives GTECA's appeal as an attempt "to convert the five-year waiver into a permanent waiver." To the contrary, as GTECA formulated its appeal in its opening brief, GTECA "seeks reversal of a decision of the Federal Communications Commission rendered on November 9, 1993." That decision explicitly took two actions: "we rescind the original rule waiver in its entirety. We also rescind GTECA's associated Section 214 authorizations to operate and maintain the coaxial and fiber optic cable facilities in Cerritos." The rescission of the waiver is not an issue because the waiver has expired by its own terms. The rescission of the Section 214 authority remains before the court. GTECA's position is that it may continue to act under its Section 214 authority without a waiver because the statute keeping telephone companies from being television programmers is constitutionally defective.
 
 
 44
 The court says: "We need only determine whether the authority for which the waiver was required, i.e. video programming, expired with the waiver." It would be difficult to put the issue more mistakenly. GTECA nowhere contends that it was "granted permanent Section 214 authority to engage in video programming by the FCC," and the court, deciding that GTECA never had such authority, decides an issue not before it. What GTECA argues is that the FCC cannot deny authorization solely on the ground that GTECA is a telephone company. That argument, the substance of GTECA's appeal, cannot be dodged by deciding an issue never raised.
 
 
 45
 The court's further discussion of mootness is, accordingly, misplaced. There is no need to explore the criteria of mootness when a live controversy exists between appellant and appellee.
 
 
 46
 Second. By our order of January 21, 1994, Pacific Telesis Group, Pacific Bell and Nevada Bell were allowed to intervene in this appeal. The intervenors, as they declare, are building a multi-billion dollar information highway, in which video programming is expected to become part of a telephone network. The intervenors' plans are of great significance to the populations of California and Nevada. The intervenors' plans are partially blocked by the challenged statute. The intervenors' interests are as much involved as GTECA's in contesting the constitutionality of legislation that so radically reduces their right to do their own video programming.
 
 
 47
 Intervenors Pacific Telesis Group, Pacific Bell and Nevada Bell are not mere amici curiae, whose arguments and briefs may be read if the court chooses. Intervenors, they are before this court challenging the statute on its face. Nothing has mooted their challenge. Even if the court were correct in its mistaken analysis of GTECA's appeal, the intervenors' case calls for decision: "The weight of authority in the United States Courts of Appeals supports the principle that an intervenor can continue to litigate after the dismissal of the party who originated the action." Benavidez v. Fong Eu, 34 F.3d 825, 830 (9th Cir.1994), quoting United States Steel Corp. v. EPA, 614 F.2d 843, 845 (3d Cir.1979); see also 7C Wright, Miller and Kane, Federal Practice and Procedure Sec. 1920 at 491 (2d ed. 1986).
 
 
 48
 The majority attempts to distinguish Benavidez, supra, as though it were an ad hoc disposition of a single case, rather than a precedent to which we have an obligation. Unless good reason appears to distinguish Benavidez, we are bound to follow it in similar situations. This is a similar situation. That the intervenors did not participate in the FCC proceedings is surely not dispositive; Benavidez cited with approval a case where the Court of Appeals remanded to the district court to allow an individual to intervene who did not intervene before the case was heard on appeal. Benavidez at 831, citing Atkins v. Bd. of Educ. of North Carolina, 418 F.2d 874 (4th Cir.1969). In Benavidez itself the state defendant had argued that dismissal of the intervenors' complaint was appropriate because the intervenors' "only interest in intervention was to ensure that, should the district court fashion a remedy, that remedy would comport with the Voting Rights Act." Id. We held that this narrow reading mischaracterized the intervenors' claim, noting that despite dismissal of the original plaintiffs in that case, the intervenors still had a cognizable interest in contesting the validity of the redistricting plan. Like the state in Benavidez, the majority here ignores the broad issue raised by the intervenors. As we wrote in Benavidez, "refusing to allow the intervenors to continue would lead to senseless delay, because a new suit would inevitably bring the parties, at a much later date, to the point where they are now." Id. As in Benavidez, the majority's refusal to allow the intervenors' case to continue is based on a mischaracterization of their claims and will result in senseless delay.
 
 
 49
 Third. The court states: "This case also presents a serious question of exhaustion because GTECA did not present the constitutional issue to the Commission at a point in the proceedings where it could have tried to obviate the constitutional question by granting discretionary relief, such as a permanent waiver." The court does not develop this "serious question" further. But the court had earlier answered its own question in these words: "Because the Commission has no power to declare Section 533(b) unconstitutional ... we can assume it will continue to require telephone companies to comply with it." GTECA was not required to do a futile act. Reid v. Engen, 765 F.2d 1457, 1461 (9th Cir.1985) ("We may decide an issue not raised in an agency action if the agency lacked either the power or the jurisdiction to decide it"). To imply that GTECA should have raised the constitutional issue as a ploy to induce the FCC to exercise discretion is to turn the requirement of the exhaustion of administrative remedies into a game of bunts and sacrifice plays. That is not the purpose of the exhaustion requirement. See Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466-67, 45 L.Ed.2d 522 (1975). GTECA was not required to ask the FCC to do what the FCC had no power to do.
 
 THE MERITS
 
 50
 The case being properly before us, although not decided by my colleagues, I go on to indicate what its proper resolution should be.
 
 
 51
 The Level of Review. The level of review of the constitutionality of Section 533 is intermediate. Turner Broadcasting System, Inc. v. Federal Communications Commission, --- U.S. ----, ----, 114 S.Ct. 2445, 2469, 129 L.Ed.2d 497 (1994). Consequently, the statute will be sustained if it furthers a "substantial governmental interest," which is "unrelated to the suppression of free expression," and the incidental restriction on speech is "no greater than is essential to the furtherance of that interest." Id., quoting United States v. O'Brien, 391 U.S. 366, 377, 88 S.Ct. 1665, 1679, 20 L.Ed.2d 640 (1968).
 
 
 52
 Substantial Government Interest Unrelated To The Suppression Of Free Expression? The statute, the FCC informs the court, is "intended to promote diversity of ownership in local mass media," a purpose which has been a long-standing goal of national telecommunications policy. FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 789-90, 98 S.Ct. 2096, 2109-10, 56 L.Ed.2d 697 (1978). The purpose is a purpose of general antitrust law, specifically adapted to the mass media. As the purpose is to multiply the number of voices speaking, the statute does discriminate against the telephone companies; it does suppress their speech. But where ownership of a newspaper or a cable TV station along with a broadcast station has been the issue, this kind of governmental promotion of diversity, accompanied by governmental discrimination against the speech of the newspaper-broadcaster, has been permitted. Id. According to precedent, the governmental interest is substantial and, if not unrelated to the suppression of speech of some entities, is nonetheless not treated as censorship.
 
 
 53
 Essential To The Furtherance Of That Interest? Speech, the statute does affect, however. The statute, therefore, must meet the third criterion of Turner. As elaborated by Turner, "essential to the furtherance" of the governmental interest means that the methods chosen by the government do not " 'burden substantially more speech than is necessary to further the government's legitimate interests'." Turner --- U.S. at ----, 114 S.Ct. at 2469, quoting Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). To show that this criterion is met, the FCC argues as follows: In most areas telephone companies enjoy a monopoly. A telephone parent could subsidize a video-programming affiliate by transferring its costs to the parent, which would impose them on the customers of its telephone lines. A telephone company could also discriminate against those competing with it in cable TV by making it more difficult for these competitors to maintain interconnections with the national telecommunications network. By preventing these speculated evils from occurring, the statute furthers the substantial interest of the government and burdens no more speech than is necessary to achieve that end.
 
 
 54
 These arguments are, to begin with, very wide of the mark. They are arguments against cross-ownership of a telephone company and cable TV. But the statute does not bar a telephone company from owning cable TV. Section 533 only precludes programming by a telephone company. It is a restriction squarely focused on the speech of the telephone company.
 
 
 55
 The prevention of speculative evils is insufficient to justify the statute's suppression of speech. We must accord "substantial deference to the predictive judgments of Congress." Id. at ----, 114 S.Ct. at 2471. But we must be assured "that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." Id. The "recited harms" must be "real, not conjectural." Id. at ----, 114 S.Ct. at 2470. Abstractly, the FCC's argument has a certain plausibility. Concretely, not only is it conjectural, it is contrary to fact. The FCC itself regulates the accounting of GTECA and requires that GTECA maintain separate accounting for all costs associated with its cable operation under Section 214. The FCC itself has found in this case that its requirements are sufficient to prevent the misallocation of cable costs to telephone customers. The FCC has found that its regulations are regularly sufficient to prevent such misallocations. "Based upon our experience with such safeguards," the FCC has reported to Congress, "we continue to believe that they constitute an effective means of preventing cross-subsidization between regulated and nonregulated services." FCC, Second Report And Order, Recommendation To Congress, And Second Further Notice Of Proposed Rulemaking, (Video Dialtone Order) 7 FCC Rcd 5781, 5829 (July 16, 1992). The FCC, no doubt, is entitled to change its mind based on new experience. But the FCC refers to no new experience that occurred between July 16, 1992, and April 11, 1994, when it filed its brief in this case that would make one doubt the sufficiency of the FCC regulations controlling a telephone company's accounting for costs. It may well be doubted that the FCC is free to tell Congress that its controls are adequate and to tell this court that they are inadequate. It is certain that such double talk undermines all confidence in the conjecture on which the Commission relies.
 
 
 56
 As for the putative discrimination by telephone companies against competitors, the FCC refers, with great vagueness, to having received "complaints that telephone companies were in various ways misusing their monopoly telephone service power to favor cable television operations in which they had an interest." The validity of these old complaints--they are dated as occurring in 1970--is unsubstantiated on the record. The FCC does not demonstrate that "the recited harms are real."
 
 
 57
 Not only is there a lack of demonstration that the statute furthers the governmental interest in diversity, but there is substantial evidence that the statute does the opposite. In the case at bar, the application of the statute will deprive Cerritos of its only cable service. Throughout the country it is notorious fact that cable systems are frequently monopolies, whose only competition is provided by broadcast television. To shut out the telephone companies as cable programmers, as the statute so comprehensively does, is to shut out the only kind of enterprise likely to challenge the cable TV monopolist.
 
 
 58
 In its Video Dialtone Order of July 1992, the Commission itself reviewed the market, the changing technology, and the great opportunities for providing more information to the public by the entry of telephone companies as cable operators. The Commission formally recommended to Congress that the Cable Act be amended to eliminate the ban of Section 533. The Commission stated: "We find that such an amendment would further promote our overarching goals in this proceeding by increasing competition in the marketplace, spurring the investment necessary to deploy an advanced infrastructure, and increasing the diversity of services made available to the public." Video Dialtone Order, 7 FCC rec. at 5847. What facts have changed since the Commission made this considered judgment in July 1992? We are not told of any. In the Commission's own report, Section 533 is not essential, not necessary, but counterproductive. It does not survive intermediate review under the First Amendment. It does not even survive rationality review. It is an irrational obstruction to the exercise of free speech.
 
 
 
 [1]
 Final Report and Order, In re Applications of Tel. Cos. for Section 214 Certificates, 21 FCC 2d 307, 330-31 (1970), modified, 22 FCC 2d 746
 
 
 [2]
 The Commission's rules and 47 U.S.C. Sec. 533(b) are parallel to some degree. However, 47 C.F.R. Sec. 63.54 in defining "affiliate" and "control" says the terms "bar any financial or business relationship whatsoever by contract or otherwise, directly or indirectly between the carrier and the customer, except only the carrier-user relationship." By contrast, section 533(b) prohibits a carrier from providing video programming "directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier." In this case, the Commission's rules proscribed the use of Robak to build the system, but the statute did not
 
 
 [3]
 GTECA states the issue on this appeal is "[w]hether 47 U.S.C. Sec. 533(b) and 47 C.F.R. Sec. 63.54, which ban telephone common carriers from providing 'video programming' to subscribers in their telephone service areas, directly or indirectly through an 'affiliate,' violate the First Amendment, on their face or as applied."
 
 
 [4]
 In this regard, we note that the United States District Court of the Eastern District of Virginia has held Section 533(b) unconstitutional on a facial challenge by a local telephone carrier. Chesapeake and Potomac Tel. Co. v. United States, 830 F.Supp. 909 (E.D.Va.1993). The case has been argued and is currently pending on appeal. The United States District Court for the Western District of Washington recently held Section 533(b) unconstitutional and granted the telephone carrier-plaintiff summary judgment. US West, Inc. v. United States, 855 F.Supp. 1184 (W.D.Wash.1994). In addition, a case pending in the Northern District of California in which the constitutionality of Section 533(b) was raised was stayed waiting for our decision here. Pacific Telesis Group v. United States, No. CV93-20915-JW (N.D.Cal. April 15, 1994), appeal docketed, No. 94-16064 (9th Cir. June 21, 1994). So there is no question about the ultimate review of the important constitutional question GTECA belatedly attempts to raise here
 
 
 [5]
 Since the participation of Robak in the project is long since finished, GTECA will not need a waiver of the Commission's affiliation rules which led to the remand by the D.C. Circuit. If GTECA does apply for a new waiver, the Commission will not be bound by the terms of the D.C. Circuit's mandate
 
 
 [6]
 The "capable of repetition, yet evading review" exception was applied in the recent case of Miller v. California Pac. Medical Ctr., 19 F.3d 449 (9th Cir.1994), which involved an injunction under Section 10(j) (29 U.S.C. Sec. 160(j)) of the National Labor Relations Act pending action on an unfair labor practice charge by the Board. Although the Board's resolution of the unfair labor practice complaint rendered the 10(j) proceeding moot, the fact that the ordinary course of such proceedings would make it impossible for any court to effectively review the injunction put the case within the exception to mootness. Id. at 454. Here, the Commission's actions on GTECA's tariff filing can be reviewed in the ordinary course of appellate review, which distinguishes this case from Miller